# Staunton.

## THE CLINTWOOD COAL CORPORATION v. JOHN R. TURNER, ET AL.

September 21, 1922.

1. APPEAL AND ERROR—*Final Judgments and Decrees—Adjudicating Principles of the Case—Decree Refusing Injunction but not Dismissing Bill.*—Where the court and the parties understood that the case was submitted for a decree upon the merits, no further proof being contemplated, and the court took the case "for final determination" pursuant to an agreed decree formerly entered in the cause, a decree that the complainant was not entitled to the injunction prayed for necessarily adjudicated the principles of the cause, and was clearly appealable under Code of 1919, section 6336, notwithstanding that through inadvertence or otherwise the decree failed to dismiss the bill at complainant's cost.

2. MINES AND MINERALS—*Mining Lease—Implied Condition to Operate—Case at Bar.*—Where nothing of value was paid for a mining lease, no consideration moving to the lessor being contemplated or provided for except the royalties on coal actually shipped, and the benefit to be derived from a commissary to be operated by the lessor, there would be an implied condition that the lessee should begin to prospect and to operate the mine within a reasonable time, even if the lease had been silent on the subject. In the instant case, however, the lease specifically stipulated for an active and energetic prosecution of the work, and cessation of the operation of the mine by the lessee for a period of more than a year for causes not excepted in the lease amounted to an abandonment and forfeiture.

3. MINES AND MINERALS—*Mining Lease—Abandonment and Forfeiture—Lessee Unable to Work at a Profit—Case at Bar.*—The consideration for a mining lease was royalties and the right of the lessor to operate a commissary. The lease was for ten years with a provision that the lessee might terminate it at any time by turning back the property and permanent improvements to the lessor. The lease stipulated for an active and energetic prosecution of mining by the lessee, taking into consideration the disadvantages that it might incur in the employment of labor, strikes, car shortage, high water, etc., for which the lessee did not stand responsible. The lessee abandoned mining for more than a year, claiming it had a right to quit work under the lease until it could operate at a profit, and yet not surrender the lease.

*Held:* That the lessee had no right to an injunction against the successors of the lessor to prevent them from operating a coal mine on the property.

4. MINES AND MINERALS—*Mining Lease—Abandonment and Forfeiture— Lessee Unable to Work at a Profit—Case at Bar.*—A mining lease for ten years, where the only consideration to the lessor is a royalty, and the lease is determinable at the option of the lessee, is not a lease at the will of either the lessor or lessee, but a lease for ten years liable to be determined suddenly by the exercise of the option of the lessee. And while the termination of the lease was at the will of the lessee, he could not terminate it without suffering the consequences. Read as a whole, the lease meant that the lessee must operate or quit, and if he quit, there was a mutuality of obligation, the lessor being bound to release him, and the lessee being bound to surrender the lease permanently under the terms therein specified. The construction that the lessee had a right to quit work unless it could operate at a profit would be inequitable.

5. MINES AND MINERALS—*Mining Lease—Lessee's Duty to Operate Where He Cannot Work at a Profit.*—It is, of course, competent for a lessor to confer upon the lessee the right to operate only so long as he can make a profit, but this right must be clearly provided for. The general rule of interpretation, and the one consonant with reason, is that where the only consideration for a mining lease is the royalty on coal actually mined, the lessee must operate with reasonable diligence, and failing in this, must surrender the property.

6. MINES AND MINERALS—*Failure to Operate—Forfeiture.*—Where the only consideration for a mining lease is a prospective royalty, failure to perform covenants to operate will give rise to a forfeiture though no forfeiture clause is contained in the lease.

7. MINES AND MINERALS—*Mining Lease—Recognition of Existence of Lease in Conveyance by Lessor—Case at Bar.*—A clause in a deed by the lessor of mineral rights provided that it was expressly understood that the grantees stood good for the lease previously made by the grantor to complainant in the instant case, provided complainant "has a *rite* to mine said coal." It was contended that this was a recognition of the existence of the lease to complainant, notwithstanding complainant's failure to mine.

*Held:* That the phraseology of the clause as a whole did not convey that idea, but that the stipulation was evidently inserted merely as a matter of prudence.

Appeal from a decree of the Circuit Court of Dickenson county. Decree for defendants. Complainant appeals.

*Affirmed.*

The opinion states the case.

*A. A. Skeen* and *S. H. & Geo. C. Sutherland,* for the appellant.

*W. A. Daugherty* and *S. P. Riddle,* for the appellees.

KELLY, P., delivered the opinion of the court.

This suit in equity was brought by the Clintwood Coal Corporation to enjoin John R. Turner, F. J. Turner and Nancy Turner, and their lessee, Hibbard Fleming, from operating a coal mine on the land owned by the Turners, and to require the defendant to account for rents and profits alleged to be due for past operations. The relief prayed for was denied by a decree of the circuit court, and thereupon the coal corporation obtained this appeal.

On July 26, 1917, Charles R. Turner, father of the three Turners mentioned above, "for and in consideration of the sum of one dollar cash in hand paid to the party of the first part (Turner) by the party of the second part (coal corporation)," and for the further consideration thereinafter more fully set forth, leased to the coal corporation "for the purposes of prospecting, mining and manufacturing coal," a tract of land in Dickenson county containing about thirty acres. The lease was to be effective for a period of ten years, and at the expiration of the term all structures and improvements, such as buildings and tipples, placed on the land were to become the property of the lessor and left on the premises, but the steel rails and machinery, tools, etc., were to remain the property of the lessee. It was further provided that the lessee should not own or operate any commissary on the premises, this

privilege being expressly and exclusively reserved by the lessor. The royalty to be paid was fifteen cents a ton on all coal mined and shipped from the premises, the quantity to be determined by railroad shipments, and settlements to be made monthly. The lease further contained the following covenants and stipulations:

"The party of the second part agrees and binds itself to use its best endeavors to put out as much coal per day as possible after getting the said operation started, taking into consideration the disadvantages that it may incur in the employment of labor, strikes, car shortage, high water, etc., for which the party of the second part does not stand responsible, it being the intention to push this work as speedily as possible so as to make the output as heavy as reasonably can be, under the particular circumstances governing this operation.

"It is further agreed and understood that, if for any cause during the existence of this lease the party of the second part may desire to terminate the same, then it shall have the right to do so by turning back to the party of the first part the premises embraced in this lease, together with any permanent improvements placed thereon, such as houses, etc., not including machinery, tools, etc."

Shortly after the execution of the lease, the coal company proceeded to open and operate a mine on the premises. The operation was a small one. The coal opening was about a mile from the railroad, and the coal was hauled from the mine in wagons and loaded into railroad cars. The lessee continued the work until the latter part of August, 1918, when it quit, because, as it claims, the mine could not be worked at a profit. Such equipment as the lessee owned was left at or in the mine.

On the 22nd of September, 1919, more than a year after the coal company had ceased to operate, Charles R. Turner conveyed to his two sons, J. R. and F. J. Turner, and his daughter, Nancy Turner, a tract of land which included the leased premises, and the deed therefor contained this clause: "And it is expressly understood that the parties of the second part *is* to stand good for a lease made by C. R. Turner and wife to the Clintwood Coal Corporation, provided said coal corporation has a *rite* to mine said coal, but said second parties *is* to have the royalty."

When the lessee ceased its operations in August, 1918, it was financially embarrassed, and among the debts which it owed was one to Charles R. Turner in the sum of $180.00 for royalties and for hauling coal from the mine to the railroad. Turner was unable to collect this debt by persuasive means, notwithstanding a number of attempts, and finally, in October, 1919, obtained a judgment therefor before a justice of the peace. Proceeding under an execution issued on this judgment, the deputy sheriff levied on the mine equipment and on the lease, and sold the same at public auction. An attorney representing the company was present at the sale, and, so far as appears, made no protest. The lease and the tangible personal property (except a small portion of the equipment not embraced in the first levy, and sold later) was sold on the 10th of December, 1919, and bought in by, or on behalf of, J. R., F. J. and Nancy Turner, the grantees in the above mentioned deed. Whether the levy on the lease and the subsequent sale thereof were valid is a question which has been discussed at length in the oral argument and briefs in this case, but need not be decided, for reasons hereinafter appearing.

From August, 1918, to December, 1919, when the

sheriff's sale was made, the mine and personal property had been almost wholly neglected. The plant had fallen into very bad condition and required a good deal of work before it could be again operated. Subsequent to December, 1919, the Turners worked there on a small scale for a short time, and then, in March, 1920, leased the property to Hibbard Fleming, who has since possessed and operated the same.

Soon after the sheriff's sale of the property the price of coal began to advance, and a short time after the Turners leased to Fleming the mine here involved, like all others in that locality, began to yield handsome returns.

The evidence is in conflict in some particulars, and is very unsatisfactory as to just when or how the representatives of the coal company notified the lessor of its purpose to quit the operation. At any rate, the lessee did quit in August, 1918, and did not make any serious effort to resume until after the lease had been made to Fleming. After that time the coal company seemed to become more and more interested because of the advancing price in coal until this suit was finally brought. At that time coal from this mine was bringing something in excess of $14.00 per ton f. o. b. cars at the railroad, and this price yielded a profit to the operator of about $9.00 per ton.

1. The appellees moved to dismiss on the ground that no appeal lies from a decree refusing the injunction. The facts material to the motion are these: On July 26, 1920, the complainant notified the defendant that on August 4th it would move for an injunction, and on the latter date the bill and certain affidavits, and the defendant's demurrer and answer and certain other affidavits, were presented to the judge in vacation, and an agreed decree was entered to the following effect:

"Upon consideration whereof, and by agreement of the parties this case is further continued for a period of thirty days, for the purpose that each party may in that time take and file such depositions as each or either of them may desire, and by agreement of the parties this cause is to be submitted to the court, not later than the expiration of the said thirty days, or to the judge in vacation for a final determination thereof, and any decree so entered by the said Judge in vacation, by this agreement is to be of the same force and effect, and binding as if the same was entered in term time, and this cause is continued till the 7th day of September, 1920."

Pursuant to this decree the parties took all the proof desired on either side upon the merits of the controversy, and on September 14, 1920, in the vacation of the court, the following decree was entered:

"The above entitled cause having been argued by counsel for both parties, respectively, at a former day and now coming upon the papers formerly read, the order entered in the cause heretofore, the depositions taken in behalf of the complainants, and defendants, respectively, the briefs of counsel and the same having been duly considered, and being of opinion that complainants are not entitled to the injunction prayed for, the same is refused."

[1] It is perfectly clear that the court and the parties understood that the case was submitted for a decree upon the merits. No further proof was desired or contemplated on either side, and the court took the case "for final determination" pursuant to the agreed decree formerly entered in the cause. If the court had been of opinion to award the injunction, it would then have been necessary to refer the cause to a commissioner to take an account, but having

decided that the complainant was not entitled to the
relief prayed for, nothing remained to be done except
to dismiss the bill at the complainant's cost.   The
failure to do the latter was doubtless a mere oversight
or inadvertence.   The decree necessarily adjudicated
the principles of the cause, and was clearly appealable.
Code 1919, section 6336.   The motion to dismiss is
overruled.

[2, 3] 2.  In our view of the case the decisive question
is whether the coal company's conduct and attitude
with respect to the operation of the mine amounted
to an abandonment, and operated a forfeiture of the
lease.   This question must be answered in the affirm-
ative.   Nothing of value was paid for the lease.   No
consideration moving to the lessor was contemplated
or provided for except the royalties on coal actually
shipped, and the benefit to be derived from a com-
missary to be operated by the lessor, the value of
which depended solely upon the operation of the mine.
If the lease had been silent on the subject, there would
have been an implied condition that the lessee should
begin to prospect and to operate the mine within a
reasonable time.   See *Cowan* v. *Radford Iron Co.*,
83 Va. 547, 3 S. E. 120.   The lease, however, specifi-
cally stipulated for an active and energetic prosecution
of the work.   None of the disadvantages, such as
"employment of labor, strikes, car shortage, high
water, etc.," for which the lessee was not to be held
responsible, appear to have affected the operation.
It was contended, and there was evidence to support
the contention, that governmental regulation of coal
prices and denial of the use of box cars for coal ship-
ments rendered the operation unprofitable; but there
was no shortage of regular coal cars.   There was no
mention of any condition allowing the lessee to cease

operations except that which permitted him to quit permanently and surrender the lease.

There is some confusion in the testimony as to what, if anything, passed between the parties at and after the mines were closed by the lessee, but this is immaterial, because the coal company squarely and unequivocally takes the position in this suit that it had the right to quit work until it could operate at a profit, and that it proposed to hold on to the lease for the full term of ten years without striking a lick unless it could do so at a profit. It did stop work for more than a year, failed, and refused in the meantime to pay the balance which it owed the lessor, left the mine without care or attention, permitted the property to fall into bad repair, and evidently intended to leave it thus throughout the term of the lease, unless in its arbitrary judgment it could go back to work at a profit. To be sure the lessee claimed to expect conditions would get better, but that is beside the mark. The fact remains that it did not intend to operate unless it could do so at a profit, and yet did not intend to surrender its claim upon the lease until the end of ten years. This meant that the lessee might deprive the owner of any use of or income from the property until the end of the term.

In view of these facts it is perfectly manifest that the lessee has no right to an injunction.

The lessee, as we construe it, meant that, subject to labor troubles and other causes specifically stipulated against, the lessee was bound to operate the property and prosecute the mining continuously and with reasonable diligence throughout the term of the lease, regardless of the question of his own profit. If he found that he could not operate the property at a profit, his remedy was clear and adequate, because there was an express stipulation giving him the right

to quit, but when he did so, he had to surrender the property in the manner therein provided for. He could not play fast and loose with it.

The following language of this court in *Rorer Iron Co.* v. *Trout and Wife*, 83 Va. 397, 409, 2 S. E. 713, 718, 5 Am. St. Rep. 285, is pertinent: "The lease was for a term of twenty years; yet looking to its nature and object it cannot be contended that the lessee had the option to work or not to work the ore mine for an indefinite time, and thus convert what was designed to yield a handsome daily income to the lessors into a mere barren encumbrance on his land, a cloud on his title, an incubus and a manacle which would oppress him and destroy the marketable value of his land."

In the case of *Cowan* v. *Radford Iron Co.*, 83 Va. 547, 550, 3 S. E. 120, 121, it appeared that the lessee "did not propose to mine iron ore at a loss nor would they allow others to operate this iron ore at a profit." The court held that the lessee could not be allowed to maintain any such inequitable and unreasonable position, and entered a decree cancelling the lease. In that case the court said: "Regard should be had to the intention of the parties, and such intention should be given effect. To arrive at this intention, regard is to be had to the situation of the parties, the subject matter of the agreement, the object which the parties had in view at the time, and intended to accomplish. A construction should be avoided, if it can be done consistently with the tenor of the agreement, which would be *unreasonable* or unequal, and that construction which is most obviously just is to be favored as most in accordance with the presumed intention of the parties."

It is further pertinently said in the *Cowan Case*, *supra:* "The agreement in question may be denomi-

nated a 'mining lease.' The ore and minerals are sold, and the purchaser is invested with the usual mining rights, which are enumerated. These rights are to begin at once, at any time after the date of the agreement, the compensation is to be paid *quarterly*, as the iron ore is mined. No time is specified for the work to end, and for these rights to expire. But a stipulation is inserted, by which it is further and expressly agreed that the company shall have the right and privilege of removing from the said tract of land, at any time, any machinery, buildings, fixtures, or improvements made or erected upon it by the said company. If one party may, then, terminate the lease at any time, it may will it; if this estate is at the will of one of the parties, it is equally at the will of the other."

[4] We do not mean to say that the lease here involved was a lease at the will of either the lessor or lessee. It was a lease for ten years liable to be determined suddenly by the exercise of the option of the lessee. 1 Minor on Real Property, p. 455, section 379. But while the termination of the lease was to be at the will of the lessee, he could not terminate it without suffering the consequences. Read as a whole, the lease meant that the lessee must operate or quit, and if he quit, there was a mutuality of obligation, the lessor being bound to release him, and the lessee being bound to surrender the lease permanently under the terms therein specified. The construction contended for by the lessee in this litigation is inequitable and cannot be sustained.

[5] It is, of course, compentent for a lessor to confer upon the lessee the right to operate only so long as he can make a profit, but this right must be clearly provided for. The general rule of interpretation, and the one consonant with reason, is that where the only

consideration for a mining lease is the royalty on coal actually mined, the lessee must operate with reasonable diligence, and failing in this, must surrender the property. This is exactly the holding of this court in *Cowan* v. *Radford Iron Co., supra.*

In *Shenandoah Land Co.* v. *Hise,* 92 Va. 238, 23 S. E. 303, Judge Cardwell, speaking for this court, and expressly reaffirming the principles announced in *Cowan* v. *Radford Iron Co.,* in the course of the opinion said: "The contention of the appellant is that by this agreement Nicholas acquired title to all the minerals on the lands of Sheffer to which the agreement had reference, for the period of ninety-nine years, with the additional right of renewal for a like term, and that the question of abandonment does not enter into the case; in other words, that this agreement is irrevocable. This contention cannot be maintained. The record shows that no consideration passed from Nicholas to Sheffer when the agreement was made, and therefore the real consideration moving Sheffer to enter into the agreement was the one-fourth of the profits of the minerals to be mined from this land. Nicholas might never have taken any minerals from the land, and, in that event, if this agreement is held to be a conveyance of the minerals therein, it would be to hold that there had been a sale of the minerals without a consideration. It is true that there is no covenant in the agreement on the part of Nicholas to mine the minerals; but, to give effect to the agreement, it must be held that the acceptance of it by Nicholas amounted to an agreement on his part to mine the minerals to be found on the property, and within a reasonable time; otherwise, the agreement might prove entirely fruitless to Sheffer and those claiming under him. *Caldwell* v. *Fulton,* 72 Amer. Dec. 766; and *Grubb* v. *Bayard,* 2 Wall, jun. 81. It

has been maintained as elementary law, by decisions of this court, as well as by courts of other States, that an agreement to do something other than to pay money, no time being expressed, means a promise to do it within a reasonable time."

In 27 Cyc. the text, after stating on page 707 that "sometimes under the terms of the agreement the lessee is not required to work at a dead loss," on pages 708, 709, states the general rule as follows: "On the other hand, under contracts which bind the lessee to test within a certain time and upon discovery to work the mines within a certain time, or within a reasonable time, as the consideration upon which the lease is granted, and in which no rent or other compensation is reserved except that depending upon the result of the work and mining, it is held that the performance of the lessee's obligations is a condition upon which the lease depends, and therefore the failure to perform the condition works a forfeiture of the lease; that it is the duty of the lessee to exercise the mining rights conferred in a reasonable time and manner if no time is fixed in the instrument for such performance, and upon failure to so discharge his duty, a court of equity may set aside the lease."

[6] In 20 Am. & Eng. Enc., 2nd Ed., p. 779, 780, it is said that "where the only consideration for the lease is a prospective royalty, failure to perform such covenants (to operate) will give rise to a forfeiture though no forfeiture clause is contained in the lease."

The authorities generally are to this effect, and citation thereof might be multiplied indefinitely. We cite only the following: *Loveland* v. *Longhenry*, 145 Wis. 60, 129 N. W. 650, 140 Am. St. Rep. 1068; *Starn* v. *Huffman*, 62 W. Va. 422, 59 S. E. 179; *Chandler* v. *French*, 73 W. Va. 658, 81 S. E. 825, L. R. A. 1915

B, 561; *Petroleum Co.* v. *Coal Co.*, 89 Tenn. 381, 18 S. W. 65; 18 R. C. L. p. 1190, sec. 98.

For the reasons stated and upon the authorities cited, we are of opinion that the lessee, by breach of the conditions implied from the nature and the express terms of the lease, had forfeited its right to any further claim thereunder, and this being true, it is unnecessary to consider the otherwise interesting question presented somewhat fully to us in this case as to the validity and effect of the sheriff's levy upon and sale of the lease.

[7] It has been insisted on behalf of the lessee that the provision in the deed from Charles R. Turner to his children hereinbefore set out, showed that he regarded the lease as still in effect at the time the deed was made, but we do not take this view of that provision. Its phraseology as a whole does not convey that idea. The lease was still outstanding and had never been formally cancelled, and this stipulation was evidently inserted merely as a matter of prudence.

As already pointed out, the decree appealed from in this case ought to have gone a step further and dismissed the bill at the cost of the complainant. We will amend the decree in this respect, and as thus amended, it will be affirmed.

*Affirmed.*