# Richmond

## HETTIE G. SMITH AND OTHERS v. POCAHONTAS FUEL COMPANY, INC.

February 24, 1941.

Record No. 2320.

Present, Holt, Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

*Edmund D. Campbell, Sexton & Sexton, T. C. Bowen* and *Crockett & Gillespie,* for the appellants.

*Greever & Gillespie,* for the appellee.

EGGLESTON, J., delivered the opinion of the court.

By a contract dated June 15, 1906, J. M. Smith and others, hereinafter called the lessors, leased to the Pocahontas Collieries Company, a corporation, hereinafter called the lessee, for the period of one hundred years, "the sole and exclusive privilege of mining coal and manufacturing coke from the veins or seams of coal in, upon and under" a tract of land "containing 353.79 acres, more or less," lying on the waters of Laurel Creek, in Tazewell county, Virginia. The material provisions of the contract are copied in the margin.*

---

*"The said Lessors do demise, let and lease as an incident of and part of the consideration of this lease, to the said Lessee, its successors and assigns, for a period of one hundred (100) years from the date hereof, the exclusive and sole right and privilege of using all or so much of the surface of the above described tract of land, and the stone, sand, water and all other material thereon, including all timber, as may be necessary for the operations under this lease, or other leases or tracts of land owned or controlled by the said Lessee, its successors and assigns, including the right to erect and maintain buildings or any other improvements thereon.

" * * * And the said lessors do grant and convey, also, as an incident of and part of the consideration of this lease, to the said Lessee, its successors and assigns, for a period of one hundred (100) years from the date hereof, the sole and exclusive right and privilege of passing through and under, and hauling, conveying or otherwise transporting through and under the said tracts of land the coal, minerals, timber, sand or anything it may desire to haul, convey or otherwise transport from this or any other land, adjacent, or otherwise, now owned, leased or controlled by the said Lessee, its successors or assigns, free from any charges therefor on the part of the Lessors, their administrators or executors, it being one of the conditions of this lease and incident thereto and thereunder.

"The following are the terms, conditions, covenants and stipulations of this lease:

"ARTICLE ONE: The Lessee hereby covenants and agrees to pay to the Lessors, their administrators or executors, during the continuance of this lease, as rental, the following royalties: Ten (10) cents

It will be observed that the contract provides for two classes of payments by the lessee:

(1) Under ARTICLE ONE, a tonnage royalty of ten cents per ton for each long ton of coal mined; and

(2) Under ARTICLES ONE and FIVE, an annual acreage royalty of $6.25 per annum during the first three years of the lease (no railroad having been built to the property), and $12.50 per annum during the next twenty-seven years of the lease.

Under ARTICLE FIVE the lessee is given "the privilege during any of the next succeeding years of mining, free from royalty, a sufficient amount of coal over and above the amount required to yield the minimum royalty for said year, at the rates specified above, to reimburse it for deficiency in any preceding year or years." This will be hereinafter referred to as the "reimbursement provision."

---

for each and every ton of 2,240 pounds of coal mined, dug or carried away from, or used on the 353.79 acres of land hereinbefore described, * * * . The above rents to be paid and accounted for quarterly on the twenty-fifth (25th) days of January, April, July and October of each year, for the three (3) months immediately preceding the said months respectively, after the Norfolk & Western Railway Company or some other railway company has built and constructed a line of railroad through or over the said tract of land, so that the said Lessee can conveniently and successfully operate the same, PROVIDED, however, that until the said railroad shall have been completed to the above described tract of land, and ready for the transportation of the product of the mine, and which time shall not exceed the peroid of three years from the date hereof, the minimum royalty or rental of Six Dollars and twenty-five ($6.25) cents per acre per annum, shall be accepted by the Lessors, their administrators or executors, in lieu of the minimum royalty or rental as hereinafter mentioned in Article Five of this lease. * * * PROVIDED FURTHER·that in the event said Lessee shall mine any coal underlying said property before the railroad reaches the said tract of land, as above set forth, that it shall pay for the same on the twenty-fifth (25) days of January, April, July and October, of the year in which said mining was done, but the said Lessee shall not be required to do any mining under the said tract of land herein described until the railroad has been constructed and ready for transportation.

"ARTICLE TWO: The said Lessors and Lessee, respectively, hereby expressly reserve the right and privilege to declare all the conditions, together with this lease in its entirety, absolutely null and void and of no force or effect in law or in equity UNLESS within a period

Under ARTICLE TWELVE the lessee covenants "to either mine or pay for all coal in said Pocahontas No. 3 vein, and in the said upper Smith vein of coal, underlying said tract of 353.79 acres of land, within the period of thirty (30) days from the date of this lease, at the rate of ten cents per ton of 2,240 pounds." This article further provides that if the lessee does not mine all of the coal in two seams within the thirty-year period it shall thereafter have the right, after paying for the coal, to remove it at any time or times "it may desire" during the remaining years of the lease, "free from the payments of any rents or royalties."

Under ARTICLE THIRTEEN the lessee covenants that, in addition to mining the coal found in the "Pocahontas No. 3" and in the "Upper Smith" veins, it will mine under certain conditions hereinafter noted the coal in other veins having a thickness of three and one-half feet or more.

of five (5) years from the date hereof, there has been constructed or under construction in good faith a standard gauge railroad, to be continuously used as a common carrier, then, in such case, this lease shall remain in full force and effect during the continuance hereof.

\* \* \* \* \* \* \*

"ARTICLE FOUR: The Lessee further covenants and agrees to prosecute the mining of coal from the said property to the greatest possible extent warranted by the demand for coal and coke, and the supply of railroad cars available for its transportation, but the Lessee is not compelled to mine coal, or manufacture coke from this tract of land to the detriment of its other mining operations upon other portions of its leaseholds or property, nor is the Lessee required to mine or pay for coal contained in any other than the No. 3 or Pocahontas seam and the upper Smith vein of coal, except as required by Article Thirteen of this lease.

"ARTICLE FIVE: Except as hereinbefore provided in Article One of this lease, the Lessee shall pay to the Lessors as a minimum rental or royalty under this lease, whether the quantity of coal mined or coke manufactured for the respective years shall produce that amount or not, at least the sum of $12.50 per acre per annum for each and every acre of the 353.79 acres included within this lease—said payments to be made quarterly as above provided for. Payment for any amount necessary to complete the minimum rental for any one year, shall be made on the 25th day of January of the next year, but the Lessee,

Subsequently the Pocahontas Fuel Company, Inc., became the successor in title to the Pocahontas Collieries Company.

In 1929 J. M. Smith, one of the lessors, died and a suit was instituted by Hettie G. Smith, his widow, to settle his estate. For the purpose of determining the obligations of the Pocahontas Fuel Company, Inc., to the lessors, and particularly the amount of royalties payable to the estate of J. M. Smith, deceased, under the terms of the lease, that corporation was made a party defendant.

These material undisputed facts appear from the stipulation of the parties and the depositions taken on their behalf:

The tract of 353.79 acres of land mentioned in the lease was found by later survey to contain 335.49 acres, and to be underlaid by 3,300,000 long tons of recoverable

---

however, shall have the privilege during any of the next succeeding years of mining, free from royalty, a sufficient amount of coal over and above the amount required to yield the minimum royalty for said year, at the rates specified above, to reimburse it for deficiency in any preceding year or years. * * *

\* \* \* \* \*

"ARTICLE ELEVEN: The Lessee shall pay all taxes and assessments that may be levied or assessed against the above described tract of land and the improvements thereon, and upon the coal mined and the coke manufactured during the continuance of this lease, * * * .

"ARTICLE TWELVE: The said Lessee further covenants and binds itself, to either mine or pay for all coal in said Pocahontas No. 3 vein, and in the said upper Smith vein of coal, underlying said tract of 353.79 acres of land, within the period of thirty (30) years from the date of this lease, at the rate of ten cents per ton of 2,240 pounds, and if the said Lessee shall not mine all of said vein or seam of coal, underlying said tract of 353.79 acres of land, within the said thirty (30) years as aforesaid, it shall have the right and privilege, after paying for said two veins of coal, belonging to the Lessors, which is still in and under said tract of 353.79 acres of land, to mine and remove the same, or any part thereof, without further charges therefor, at any time or during such times during the continuance of this lease, as it may desire. And it is further understood and agreed between the parties hereto that no rents or charges whatsoever shall be made against the Lessee, its successors or assigns, after the expiration of the said thirty (30) years, either for the use of the surface of said tract of land or the coal in the said two veins of coal underlying the same PROVIDED, however, that all payments, covenants, etc., have

coal in the "Pocahontas No. 3" and in the "Upper Smith" veins or seams as of June 15, 1936.

The Smith coal lands adjoin and are partly surrounded by other coal lands leased by the Pocahontas Fuel Company, Inc., and containing more than 7,000 acres. Only a small amount of coal has been taken from the Smith coal lands. This was in the years 1930 to 1934, inclusive, in connection with the construction of a drain by the lessee under and through the Smith coal lands for the purpose of draining these and certain of the lessee's other coal properties.

Due to the fact that no railroad has been constructed to the Smith property, and to the further fact that the coal thereunder lies from 800 to 850 feet below "water level," the coal under the Smith lands can be mined in no other way than through the lessee's mines in other leaseholds, and even then not without serious detriment to the lessee's other operations. In 1906 the nearest mine opening of the lessee on its other properties was about nine miles from the Smith property. In 1936 the nearest opening was about three miles away.

been complied with in accordance with the Article, as above set forth. It is distinctly understood and agreed between the parties hereto, that the Lessee, its successors or assigns, shall have the sole and exclusive right and privilege of continuing its mining operations under any portion of the said above described tract of 353.79 acres of land, after the expiration of the said thirty (30) years from the date hereof, free from the payments of any rents or royalties, *or* the full period of this lease, PROVIDED, however, that all payments, covenants, etc., have been complied with, as above stipulated, except as provided in Article Thirteen.

"ARTICLE THIRTEEN: It is mutually understood and agreed, that in addition to mining the coal from the No. 3, or Pocahontas vein or seam of coal, and from the upper Smith vein or seam of coal, underlying said above described tract of 353.79 acres of land, as hereinbefore agreed upon, the said Lessee, its successors or assigns, hereby agree that if any other veins or seams of coal are located or developed on said land, which are of a thickness of three and half feet of coal, or over, then the said Lessee will mine these veins of coal, subject to a royalty of ten (10) cents per ton of twenty-*one* hundred and forty pounds (2,240) to be paid to the Lessors on each and every ton of coal mined or used from such veins or seams of coal, and the said Lessors do grant to the said Lessee the exclusive right to mine all such veins

During the first thirty years of the lease the lessee promptly paid the annual acreage royalties provided for in the contract, amounting to $114,216.30. At the end of the thirty-year period, under ARTICLE TWELVE, the lessee was obligated to pay for the 3,300,000 tons of unmined coal in the "Pocahontas No. 3" and in the "Upper Smith" veins at the rate of ten cents per ton or a total of $330,000. The lessee claimed that in making this settlement it was entitled, under the reimbursement provision of ARTICLE FIVE, to credit for the total amount of the annual acreage payments theretofore made by it. Accordingly, it paid into the registry of the court in this cause the additional sum of $215,783.70, which with the annual payments of $114,216.30 made a total of $330,000. The trial court sustained the lessee's contention that it was entitled to this credit.

The trial court sustained the further contention of the lessee that under the terms of the lease it was not required at the end of the thirty-year period to pay for

of coal, or any other thinner veins of coal located upon said land, with the understanding and agreement, however, that the Lessee shall not be required to mine any vein of coal under three and half feet in thickness, unless said veins of coal can be mined by the Lessee at a net profit of ten (10) cents per ton, and it is also understood and agreed that royalties payable on coal that may be mined from any thin vein or seam of coal, other than No. 3 or Pocahontas seam, and the upper Smith seam or vein of coal, shall not be subject to any annual minimum royalty after the expiration of thirty (30) years, but shall be paid for from time to time thereafter as mined, and during the continuance of this lease, but in all other respects the mining of such veins of coal shall be subject to all the other terms and conditions of this lease.

\*  \*  \*  \*  \*  \*  \*

"ARTICLE FIFTEEN: All rents and royalties and other payments herein agreed upon, to be paid, shall be treated as rents reserved upon contract by the Lessors, who reserve unto themselves all the rights and remedies of landlords under all present and future laws of the State of Virginia, for the collection of the same, and if any of the rents and royalties, or other payments shall remain unpaid for fifteen (15) days after the same become due and payable, as before provided, the Lessors shall have the right to enforce the payment of the same by the remedies given by the law to landlords against delinquent tenants for the non-payment of rent, \* \* \* ."

any unmined coal other than that in the "Pocahontas No. 3" and in the "Upper Smith" veins.

From a decree carrying into effect these decisions the lessors have appealed.

The first assignment of error challenges the holding of the trial court that in making payment for the unmined coal in the "Pocahontas No. 3" and in the "Upper Smith" seams, the lessee was entitled to credit for the total amount of annual acreage payments theretofore made by it.

The lessors admit that if the lessee had mined the 3,300,000 tons of coal within the first thirty years of the term it would have been entitled, under the reimbursement provision, to full credit for the total amount of annual acreage payments. But they contend that since this was not done the lessee has forfeited or lost the right to this credit. In other words, the lessors say that only by mining within thirty years a sufficient amount of coal could the lessee reimburse itself or obtain credit for the annual acreage royalties paid.

The argument of the lessors runs thus:

(1) The instrument here under review is a lease and not a sale of coal in place, and the annual acreage payments or minimum royalties are "in no sense payment for coal mined or unmined" but are rentals for the privilege of holding the land and for the privilege of using its surface, the stone, sand, water, and all other material thereon as may be necessary for its mining operations.

(2) The lease, read as a whole, contemplates that the coal will be mined diligently within thirty years, and the annual acreage payments or minimum royalties are in the nature of liquidated penalties "to insure diligence and promptitude in mining."

(3) Since the coal was not mined within thirty years the lessee has lost or forfeited the privilege of reimbursing itself for the annual acreage payments advanced.

The lessee contends that since it has paid for the coal

within thirty years, as it had the right to do under the specific terms of the lease, and since it has seventy additional years within which to mine it, the privilege of reimbursing itself for the annual acreage payments extends to the seventy-year period as well.

This identical contract was before us in *Graham v. Smith,* 170 Va. 246, 196 S. E. 600, for the purpose of determining the dower rights of Hettie G. Smith, one of the appellants here, in the coal lands owned by her husband, J. M. Smith, one of the original lessors. For the purpose of that case we held (170 Va. at page 255, 196 S. E. at page 604) that this contract "is a lease and not a sale of coal in place," and that both the annual acreage payments and the tonnage royalties were rents. We still adhere to that view.

The contract provides that upon the payment of a certain amount within thirty years the lessee shall have the right to remove the coal at any time during the next seventy years, together with certain incidental privileges. Our task is to determine what amount is to be paid by the lessee for the privileges granted it. The solution of the problem turns, we think, on the proper interpretation of the language used in the contract and not upon whether the instrument is a sale of the coal in place or a lease of the land with the privilege of removing the coal.

Nor can it be logically said that the lessors may retain the annual payments on the theory that they were paid for the privilege of holding the land and for using its surface, the stone, sand, water, and the other material thereon during the thirty years of the lease. ARTICLE TWELVE expressly provides that after the payment by the lessee of the full amount due within thirty years, it shall have for the remaining seventy years of the lease the same privileges without the payment of further "rents or royalties." To follow the argument of the lessors here would be to say that the privilege of holding the land and using the surface, stone, sand,

water, etc., was worth some $114,000 during the thirty years when no mining operations were conducted on the property, and will be worth nothing during the next seventy years when the surface and the materials are to be used in connection with the mining operations. We think it is clear from the lease that upon the payment of the total amount the lessee was to have the right to remove the coal from the land and merely as incident thereto the right to use the surface, stone, sand, water, and all other material thereon as might be necessary for its mining operations.

It is true that often under mining leases the duty is placed upon the lessee of diligently mining the coal or ore within a specified time. One of the methods commonly employed to enforce such an obligation is an express provision requiring the mining of a minimum tonnage per year coupled with a provision for the payment by the lessee of annual acreage royalties so phrased as to compel the lessee to mine the specified quantity during each year or in default thereof to suffer a heavy penalty. But whether this is the purpose and effect of the particular contract depends, of course, upon the language used.

In our opinion, a reading of the present lease as a whole does not show an obligation on the lessee to mine all of the coal within thirty years, or that the provision for the payment of annual acreage royalties was inserted in the lease to enforce this purpose. Here there is no express covenant on the part of the lessee to mine any particular quantity of coal within a particular time. Indeed, there are numerous provisions in the lease which negative this view.

In the first place, the lease is for the term of one hundred years and not for thirty years. Under ARTICLE TWELVE the obligation rests upon the lessee "to either mine or pay for all coal" within thirty years. This obligation is in the alternative. The language is "either mine or pay for" and not "mine and pay for."

The article further provides that the lessee "shall have the right and privilege, after paying for said two veins of coal, * * * to mine and remove the same, or any part thereof, without further charges therefor, at any time or during such times during the continuance of this lease as it may desire." In the face of this express language how can it be logically said that there was an implied obligation on the lessee to mine all of the coal within thirty years?

Under ARTICLE FOUR the lessee's covenant to mine the coal is qualified by the phrases, "by the demand for coal and coke" and "the supply of railroad cars available for its transportation." Moreover, this article expressly provides that "the lessee is not compelled to mine coal, or manufacture coke from this tract of land to the detriment of its other mining operations upon other portions of its leaseholds or property." In this connection the undisputed testimony is, as we have seen, that the coal under the Smith lands could not have been mined without serious detriment to the lessee's other mining operations upon other portions of its mining properties.

Again, ARTICLE ONE provides that the lessee "shall not be required to do any mining under the said tract of land" until a railroad had been constructed to the property and was ready for transportation. Under ARTICLE TWO both parties were given the right to cancel the lease within five years unless a standard gauge railroad extending to the property, to be operated as a common carrier, had been constructed or commenced within that time. No railroad has been built to the property and hence no mining has been done, yet the lessors did not avail themselves of the privilege of canceling the lease. Nor did they register any protest for the failure to mine or remove the coal at any time during the thirty years. All of this indicates, we think, that the parties did not contemplate that the coal would be mined within that time.

The contract contains further evidence to this effect. If the lessee had mined each year sufficient coal to produce the minimum royalty of about $4,000, it would have required approximately eighty years to have mined the 3,300,000 tons of coal contained in the "Pocahontas No. 3" and in the "Upper Smith" seams. Stating the matter another way, to have mined the 3,300,000 tons of coal in thirty years would have required an annual production of 110,000 tons with the resulting annual royalties of $11,000, or nearly three times the amount of the minimum acreage royalties required to be paid. Therefore, if the minimum royalties had been intended as a penalty to insure the mining of the coal within thirty years, it is reasonable to assume that the annual acreage payments would have been fixed at a much larger figure than $4,000.

For these reasons we can not agree with the argument of the lessors that the provision for the payment of minimum annual acreage royalties was inserted in the lease for the purpose of compelling the mining of all of the underlying coal within thirty years.

Not having mined the coal within thirty years the lessee exercised the alternative privilege or right, granted under ARTICLE TWELVE, of paying for it at the end of that period. What, then, was it required to pay? The lessors admit that if the lessee had mined the 3,300,000 tons of coal within thirty years it would have been required to pay only the total sum of $330,000, based on royalties of ten cents per ton,—that is, the lessee would have been entitled to full credit for the annual acreage payments.

While the reimbursement provision of ARTICLE FIVE gives the lessee the privilege "of mining" a sufficient amount of coal to reimburse it for the annual acreage payments, this clause must be read in the light of the other terms of the contract. When this is done the unsoundness of the lessor's contention, that the privilege of reimbursement was conditioned upon the

mining of the coal within thirty years, becomes apparent.

■ There is nothing in the clause to suggest that the privilege of reimbursement is confined to mining within thirty years. The privilege is given "during any of the next succeeding years," which extends to the whole term of the lease and not merely to the first thirty years thereof.

■ Under ARTICLE TWELVE the lessee is given the right "to either mine or pay for" the coal within thirty years. There is nothing in the lease to suggest that the amount to be paid was to be one figure—that is, $330,000—if the coal was to be mined in thirty years, and another—that is, $330,000 plus $114,216.30—if the lessee exercised the alternative right of paying for the coal within thirty years and mining it later. Indeed, in the absence of an express provision to the contrary, it is both logical and equitable to conclude that the parties intended that the amount to be paid was to be the same in either event. Certainly there is nothing in the contract to suggest that the lessee was to be penalized some $114,000 for exercising one option, and not the other, when both are given in the same language.

■ In our opinion, it clearly appears from a reading of the contract as a whole that the parties contemplated that the annual royalties were in the nature of advance payments on the total amount due by the lessee within thirty years for the privilege of removing the coal within one hundred years, together with the incidental use of the surface of the land and the stone, sand, water, etc. Obviously this was beneficial to the lessors who thereby received the use over a period of years of a substantial portion of the money due them by the lessee.

It follows that the trial court correctly held that the total of the annual acreage payments should be credited on the amount which the lessee was required to pay for the coal within thirty years.

While not controlling, it is of interest to note that in

the original bill in this cause the same interpretation is placed on the lease. There it was alleged "that on the 15th day of June, 1936, there will be due and payable the balance of the royalties for all of the coal embraced in Pocahontas No. 3 vein, and the Upper Smith vein of coal, underlying the said tract of 353.79 acres * * * regardless of whether or not the coal has been mined therefrom, *after crediting the lessee by the minimum royalties theretofore actually paid* * * * ." (Italics supplied.)

This allegation in the bill was changed after the decision of the Circuit Court of Tazewell county in *Frazier* v. *Pocahontas Fuel Co., Inc.,* in which it was held, under the particular terms of that lease, that the annual acreage royalties were not to be credited on the total tonnage royalties. In that case we refused a writ of error to the Pocahontas Fuel Company, Inc., on September 10, 1936 (167 Va. XL).

The conclusion which we have here reached in no way conflicts with the holding in that case. That and the instant case were tried by the same distinguished trial judge. In his written opinion in the instant case the provisions of the two leases are distinguished. It is pointed out that in the Frazier lease the lessee was given the privilege "during the next succeeding *year*" of mining, free from royalty, a sufficient amount of coal "to reimburse it for the deficiency in *any preceding year,*" while in the Smith lease the lessee is given the privilege "during the next succeeding *years*" of mining, free from royalty, a sufficient amount of coal "to reimburse it for the deficiency in *any preceding year or years.*"

We have carefully considered the cases in the appellants' brief in which it was held that the minimum royalty payments were not to be credited on the tonnage royalty payments and *vice versa.* But none of these cases deals with provisions precisely similar to those here involved. Even in *Greenough* v. *Colonial Colliery Co.,* 132 Pa. Super. 270, 1 A. (2d) 174, 177, one of the principal cases relied on by the appellants, it was said that "it would

have been perfectly feasible for the parties to have provided that the total royalty payments be applied generally to the payment of all unmined coal," as was done in a number of cases there cited, and as was done in the instant case.

The next assignment of error is that the court erred in holding that the lessee was not bound at the end of the thirty-year period to pay for coal in seams other than in the "Pocahontas No. 3" and in the "Upper Smith" seams.

Under ARTICLE THIRTEEN the lessee agrees to mine, in addition to the coal in the "Pocahontas No. 3" and the "Upper Smith" veins, "any other veins or seams of coal * * * which are of a thickness of three and half feet of coal or over," upon a tonnage royalty basis of ten cents per long ton. The privilege of mining this coal in the other seams extends for the full term of the lease. But after the thirty-year period the mining "shall not be subject to any annual minimum royalty" but shall be only on a tonnage royalty basis, the royalties to be paid as the coal is mined. The article then concludes that "in all other respects the mining of such veins of coal shall be subject to all the other terms and conditions of this lease."

The lessors contend that the effect of this last-quoted language is to impose by implication an obligation on the lessee, at the end of the thirty-year period, to pay for all unmined coal in seams having a thickness of three and one-half feet, or over, on the same basis and in the same manner in which it was required to pay for that in the "Pocahontas No. 3" and in the "Upper Smith" veins under ARTICLE TWELVE,—that is, at the rate of ten cents per long ton. In their brief the lessors state that the amount of this unmined coal is approximately 2,500,000 tons, and that, therefore, the lessee should be required to pay an additional sum of $250,000.

This contention of the lessors is unsound.

It will be observed that the only provision in the lease

expressly dealing with the lessee's obligation to pay for unmined coal at the end of the thirty-year period is found in ARTICLE TWELVE. Here, "The said lessee further covenants and binds itself, to either mine or pay for all coal in said Pocahontas No. 3 vein, and in the said upper Smith vein of coal, underlying said tract of 353.79 acres of land, within the period of thirty (30) years from the date of this lease, * * * ."

Clearly the obligation of the lessee to pay for unmined coal is confined to that found in the two seams mentioned. Under the principle of *expressio unius est exclusio alterius* this excludes any obligation of the lessee to pay for coal in the other seams.

Furthermore, it is inconceivable that the parties to this agreement would have stated in express terms that the lessee should pay at the end of the thirty-year period the sum of $330,000 for unmined coal in the "Pocahontas No. 3" and in the "Upper Smith" seams, and at the same time left for mere implication the duty of the lessee to pay, and the right of the lessors to collect, the additional sum of $250,000 for unmined coal found in the other seams. On the contrary, it is reasonable to suppose that if the parties had intended that the lessee was to pay this large amount, the obligation would have been written in the lease in no uncertain terms.

ARTICLE THIRTEEN, dealing with the lessee's obligation to mine and pay for the coal in these additional seams, makes no provision for paying for the unmined coal therein at the end of thirty years. On the contrary, it says that after that period the coal in the additional veins "shall be paid for from time to time thereafter as mined."

That the coal in the "Pocahontas No. 3" and in the "Upper Smith" veins is to be paid for on a different basis from that in the other seams is shown by the fact that under ARTICLE TWELVE, after the thirty-year period, "no rents or charges whatsoever" shall be made

for the privilege of mining from the first two named seams, while under ARTICLE THIRTEEN, after the thirty-year period, coal in the other seams is to be mined on a tonnage royalty basis, the royalties to be paid as the coal is mined.

And, finally, the very language in ARTICLE THIRTEEN, relied on by the lessors, negatives their claim. After providing how the coal from the other seams is to be paid for, the language is that "in all other respects the *mining* of such veins of coal"—not the "payment" therefor, or the "mining and payment" therefor —"shall be subject to all the other terms and conditions of this lease."

The trial court correctly held that the lessee was not required at the end of the thirty-year period to pay for unmined coal in the seams other than that in the "Pocahontas No. 3" and in the "Upper Smith" seams.

On the whole it is our conclusion that there is no error in the decree appealed from, and it is accordingly

*Affirmed.*

HUDGINS, J., dissenting.

The lease to be construed contemplates two periods of time. In one period—30 years from the date of the lease—the lessee was given the right, by the annual payment of a stipulated sum designated rent or royalty, to mine and remove as much or as little coal from the premises as it desired. The other period extended the right of the lessee to mine and remove coal in two designated veins for an additional period of 70 years upon certain conditions.

In order to preserve the rights and privileges granted under the lease, the lessee was compelled to pay annually $12.50 per acre, denoted "a minimum rental or royalty," with "the privilege during any of the next succeeding years of mining, free from royalty, a sufficient

amount of coal over and above the amount required to yield the minimum royalty for said year * * * to reimburse it for deficiency in any preceding year or years. And it is hereby mutually agreed that the payments of minimum royalties or rentals made during the first five (5) years, as provided for in article one, of this lease, shall be credited on coal mined or coke manufactured, in subsequent years, in excess of the tonnage necessary to equal the minimum royalty or rental as above set forth, until the said lessee shall have been fully reimbursed for the total amount of royalties or rentals so advanced, but in no case, * * * after the expiration of three years from the date hereof, shall the minimum royalty or rental be less than twelve dollars and fifty cents ($12.50) per acre as aforesaid, until the coal in or upon the tract of land above described, shall have been taken out or paid for as provided for in article twelve of this lease."

This article (5) fixes the minimum rent or royalty and states the conditions under which the lessee might be reimbursed; that is, it gives the lessee the right to mine and remove coal and credit so much of the same as may be necessary to reimburse it for the minimum royalty or rental paid in preceding years. The lessee has mined very little coal during the whole 30-year period. It is entitled to no credit or reimbursement until the coal is actually mined and removed.

Article 12 contains the provision permitting the lessee to have its rights under the lease continued for a period of 70 years. It provides that the lessee shall "either mine or pay for all coal * * * within the period of thirty (30) years * * * at the rate of ten cents per ton * * * ." However, "if the said lessee shall not mine all of said * * * coal * * * within the said thirty (30) years * * * , it shall have the right and privilege, *after paying* for said two veins of coal * * * , *which is still in and under said tract* * * * *of land,* to mine and remove the same * * * without further charges therefor * * * . And it is further

understood and agreed between the parties hereto. that no rents or charges whatsoever, shall be made against the lessee, its successors or assigns, after the expiration of the said thirty (30) years * * * ."

A correct construction of this lease seems to me to be: (1) That the lessee had a right at any time within 30 years to mine and remove sufficient coal to reimburse it for rents and royalties paid the lessor; and (2) that if this right was not exercised, then the lessee was entitled to an extension of the rights and privileges for a period of 70 years upon paying the lessor the agreed price for the coal which remained in and under the said tract of land.

Any other construction does violence to that provision of article 12 reading: "It (the lessee) shall have the right and privilege, after paying for said two veins of coal * * * , which is still in and under said tract of 353.79 acres of land, to mine and remove the same, * * * ."