## Staunton

# Home Creek Smokeless Coal Company, Incorporated v. C. H. Combs, Et Al.

September 11, 1963.

Record No. 5602.

The opinion states the case.

*W. Clyde Dennis* and *Paul S. Hudgins* (*Hudgins & Coulling*, on brief), for the appellant.

*C. H. Combs* and *Marjorie Coleman* (*C. C. Combs; Pobst & Coleman; Combs & Street*, on brief), for the appellees.

BUCHANAN, J., delivered the opinion of the court.

Home Creek Smokeless Coal Company, Incorporated, appeals from a decree entered June 1, 1962, in three separate chancery suits brought against it, one by C. H. Combs and others, one by Lona O'Quin and others, and one by Roscoe McClanahan and others, all of which by agreement were heard together and decided by said decree. A fourth suit was also decided in the same decree but no appeal was taken therein.

The three suits involved in this appeal were brought to cancel two leases on coal lands in Buchanan county on the ground that Home Creek had not mined the coal or paid the royalties as required by the said leases.

On consideration of the pleadings, leases, stipulations and depositions, the trial court held that it was the obligation of the defendant, Home Creek, to mine the coal within a reasonable time, which the defendant had failed to do; that its failure had worked an unreasonable and extraordinary hardship upon the lessors and constituted just grounds for forfeiture and cancellation of said leases, and that the evidence showed an abandonment of the leases on the part of the defendant. It was decreed that each of the said leases be forfeited, canceled and annulled.

The lease involved in the suit of Lona O'Quin and others was dated June 1, 1931, and was made by George Looney and wife, Lona O'Quin and husband, and Lydia Fletcher and husband, to E. L. Bailey, who assigned it soon thereafter to Home Creek, herein referred to as lessee. It demised to the lessee 71 acres owned by Lona O'Quin, 71 acres owned by Lydia Fletcher, and 418 acres owned by George Looney. It stated that it was the intention of the lessors to grant to the lessee both the surface of and the coal in said lands for the term of fifty years, with the privilege of renewal for an additional fifty years, for the purpose of mining and removing all the

coal in said land and in any other lands then owned or thereafter acquired by the lessee, together with broad rights in the surface. The provisions of the lease material to the present controversy are stated in substance in the margin.[1]

---

[1] *Surface Rights:* The lessee shall have the exclusive right to occupy and use so much of the surface of the lands as necessary or convenient in mining and removing the coal from the leased premises, and from any other land owned or afterwards acquired by the lessee; the right to dump waste and drain water from mining operations on these and other lands, the right to use timber in connection with mining operations on these and other lands, and the right to use the mines and openings on the leased premises for mining and removing coal and other material from other lands owned or afterwards acquired by the lessee; and the enumeration of surface rights shall not exclude any other right which the lessee shall need in mining and removing the coal from the leased premises and any other land the lessee owned or thereafter acquired.

*Minimum Royalty:* The lessee shall pay to the lessors $1,000 per year as minimum royalty "for the land hereby leased, as long as the lessee, his successors or assigns, continue to mine coal from the lands hereby demised," payable quarterly whether or not sufficient coal is mined to produce that much at the "tonnage royalty," and this minimum royalty shall continue so long as lessee shall continue mining coal from the leased premises.

The lessee shall pay to the lessors a tonnage royalty of ten cents for each ton of coal mined "during the term of the lease," payable quarterly, to be credited on the minimum royalty of $1,000 per year, and if it equals or exceeds the $1,000 minimum it shall be in lieu of the minimum; but if it is less than the minimum for any year, the lessee shall have the right in any succeeding year or years to mine free of royalty enough coal above the minimum royalty for such year to reimburse it for the deficiency in any preceding year or years.

*Haulage Royalties:* The lessee shall have the right to haul through and over the leased premises any coal mined from any other lands, and any material necessary for such mining, for which the lessee shall pay to the lessors one cent a ton, with exceptions as to certain tracts; but after the coal on the leased premises is mined out then the lessee shall pay to the lessors $720 a year for the haulage rights, in quarterly installments, whether the coal hauled amounts to that much or not, but when the one-cent per ton equals or exceeds the $720 in any year, it shall be in lieu thereof, and if less, then the amount paid shall be a credit on the $720 payable that year and the lessee shall have the right in the next succeeding year or years to haul free of royalty enough coal above the amount required to yield the minimum for that year to reimburse it for any deficiency in any preceding year or years.

Pillars shall be left in the mines on the leased lands sufficient to maintain haulways and air courses necessary to mine and remove coal from other lands, which shall be paid for when removed, but the lessee shall not be required to pay the minimum royalty of $1,000 per year after the coal, with the exception of the pillars, is mined from the leased premises.

*Termination:* The lease shall terminate, notwithstanding the fixed term, when all the workable and merchantable coal has been taken from the leased premises, and when the lessee shall cease to have need of any of the rights of way or surface privileges provided for. When in the opinion of the lessee such time has arrived, it shall give notice to the lessors in writing, and opportunity be given to the lessors to determine whether all the workable and merchantable coal has been removed, "it being understood always that workable and merchantable coal shall be only such coal as can be mined at reasonably fair and just expenditure."

The bill in the Lona O'Quin suit alleged that Home Creek entered on the property and mined it until about March 1954, but since that time had done no mining except for one or two months in 1957 or 1958; that no coal other than the Clintwood (big) seam was ever mined and complainants do not know whether any remained to be mined in that seam, but that there were other seams on the leased premises that are, and for many years have been, merchantable and minable at a fair and reasonable profit; that the lessee agreed to pay royalty for the coal mined and for coal hauled from other lands, as set forth in the lease, but had paid none since 1954, and for these and other reasons set out in the bill said lease "has long since been abandoned and is now and has for many years been annulled, cancelled and is no longer valid and binding on the parties thereto."

The prayer of the bill was that the court adjudicate that the lease has been abandoned, and is no longer binding on the lessors; that the lessee be enjoined from mining; and if the court should decree that said lease is still in force, then that the court render judgment against defendant for all past due minimum royalty and minimum wheelage compensation, with interest.

The bill in the suit instituted by Roscoe McClanahan and others alleged that by deed of lease dated September 19, 1930, J. M. Mc-

*Mining Operations:* The lessee shall continue its mining operations "in a skillful, provident and workmanlike manner," and remove all merchantable and minable coal from the premises that can be taken, consistent with the reasonable expenditure of money and proper safety of the mines, the mining operations to be at all reasonable times open to the inspection of the lessors; and surveys and plats of the workings shall at all reasonable times be open to the inspection of the lessors.

*Bad Top:* It is understood and agreed that the top is bad "over the seam of coal intended to be mined hereunder" and the lessee shall have the right to leave whatever amount of pillars it shall deem advisable in order to support the top, and, after the coal is mined out of the leased premises, to safeguard the haulways for transporting the coal from other property.

*Records:* The lessee shall keep accurate records of all coal mined or transported and furnish a statement thereof to the lessors, who shall have the right to examine the books and records to verify weights and amounts. The lessee shall keep the workings surveyed and furnish the lessors at such place as they may from time to time designate to the lessee by notice in writing, a map of the workings.

*Liens:* All royalties and other money at any time due to the lessors shall be treated as rents reserved for the use of the leased premises, for the collection of which the lessors shall have all the rights and remedies of a landlord, and shall also have a lien on all buildings and other property of the lessee of any kind on the leased premises as security for payment of all royalties and other money at any time due to the lessors and not more than six months past due.

*Other Seams:* The lessee shall determine whether or not it can mine at a reasonable profit the seam of coal under what is known as the "big seam" and is not compelled to operate and mine any seam of coal above the big seam unless it so desires.

Clanahan and Osie Shortridge and her husband leased all the coal in 270 acres (which adjoined the land in the Looney lease) to E. L. Bailey, who assigned the lease to Home Creek Smokeless Coal Company, which mined coal therefrom for several years; that Osie Shortridge owned one-third of the tract and the other complainants owned two-thirds, undivided; that Home Creek mined part of the Clintwood, or big, seam, but no other seam, and ceased mining about March 1954, and in effect had abandoned said lease, failed to pay the minimum royalty on numerous occasions, failed to mine the coal as speedily as possible, "and in effect when it mined all the coal it desired to mine from the Clintwood, or Big Seam, of coal, said lease was terminated, notwithstanding the term provided in said lease, because at that time no other seam or seams on the demised premises could have been mined at a fair, reasonable and just profit."

The bill then alleged that for the past ten or twelve years other seams of coal under the Clintwood seam have been mined on lands near the leased premises and could have been mined at a profit on the leased premises. Therefore, alleged the bill, the lease had been canceled, forfeited and was no longer valid for these reasons and also because of the long delay in mining, failure to mine as required by the lease, and because the tonnage royalty provided for in the lease was about one-third of the rate prevailing now and for several years past.

The prayer was for an adjudication that the leased premises had been abandoned, or that the lease had been terminated by the actions of the defendant, and that it be forfeited and annulled and the defendant enjoined from further mining or exercising dominion over the property.

The provisions of the McClanahan lease are substantially the same as those in the Looney lease set out above in Note 1, with these exceptions: The minimum royalty is $1,500 per year; the workable and merchantable coal to be taken is only such coal as can be mined "at reasonable, fair and just profit"; royalties shall be paid two-thirds to McClanahan and one-third to Shortridge; when the lessee has driven its entries through the land of George Looney, it will, as soon as practicable after entering the property being leased, turn off two entries as described "so that the coal hereby leased may be mined as speedily as possible"; and the lessee shall mine all coal from the dividing point of said entries down the ridge within ten years from the date of the lease, and if not then mined the tonnage royalty of ten cents shall then be due. "This entire provision is only to apply

to the first seam mined, being what is known as the 'Big Seam'." The right of way to haul coal from other lands is limited to a certain area on the leased premises and is to be without charge.

The third suit involved in this appeal was instituted by C. H. Combs, W. Kent Pobst and the heirs of H. J. Johnson, who allege that they are the owners of a one-third undivided interest in two tracts and of the coal and mineral estate of another, totaling about 237 acres, which had been conveyed to the said Combs, Pobst and Johnson by a deed dated December 7, 1955, from a special commissioner in the chancery cause of Lona O'Quin and others v. Pattie Looney and others, brought for the purpose of settling the estate of George Looney. The bill alleged that said one-third undivided interest had been conveyed to the said George Looney by deed dated November 15, 1932, by a special commissioner in another chancery suit.

The bill then set out the provision as to after-acquired property contained in the Looney lease of June 1, 1931, as quoted in the margin.[2]

The bill then asserted that said one-third interest in the three parcels was not included in or covered by said Looney lease because the quoted provision was too vague, indefinite and uncertain to be legally effective; and, further, because the lessee had never mined any coal from said lands and had never paid any royalty either to George Looney or to the complainants, and had never given either or any of them any notice that it claimed any part of said tracts was included in said lease as after-acquired land. But if the court should hold that complainants' lands were covered by the Looney lease, then complainants prayed for an adjudication that said lease be forfeited and annulled for failure of lessee to comply with its terms.

The evidence in the case supported the allegations of fact. The testimony is uncontroverted that the lessee has never mined any coal from these lands, has never paid any minimum or other royalty there-

---

[2] "It is further understood and agreed between the parties hereto that if the parties of the first part, or any of them, should hereafter purchase or own any adjoining tract or tracts of coal, the same shall be considered as covered by this lease, under the same terms and conditions herein provided for the coal and easement rights on, over and through the premises herein leased; and the minimum royalties hereinbefore provided for shall be increased in the same proportion that the acreage of the big seam is thereby increased, provided that such increase in acreage of the big seam shall not be more than the lessee, his successors or assigns, can conveniently operate, taking into consideration the size of the plant and the amount of the equipment that the said lessee, his successors or assigns, may have installed at the time said increase is made."

for, and has never given any notice to the owners that it claimed these parcels of land to be subject to its lease. To the contrary, the evidence is that one of the owners wrote to the lessee company soon after the conveyance in 1955 to inquire whether the property was in the lease, but received no reply. Lessee by its counsel stated in the record that it made no contention that it had paid these complainants because it was its position that it did not owe them anything. There was no explanation of why this was so and the only reason it could be so was that it had not accepted these lands under the privilege given it in the Looney lease. This privilege was in the nature of an option, to be exercised by the lessee if the increased acreage of the "big seam" was no more than it could conveniently operate, considering the size of its plant and the amount of its equipment "at the time said increase is made."

For nearly thirty years after title vested in George Looney the lessee did nothing to indicate an acceptance of its option. If the lessee desired to exercise its right it owed the duty of giving notice thereof within a reasonable time after George Looney acquired the property (*Turner* v. *Hall*, 128 Va. 247, 104 S.E. 861), and the further duty to pay an increased minimum royalty. The lessee did neither of these things.

We therefore modify the decree of the trial court that the said lease from George Looney and others be forfeited, canceled and annulled "insofar as said complainants' interests in the coal covered by said lease are concerned," and we hold, instead, that said lease does not include or in any manner affect the interest of said complainants in said three tracts of land.

For the reasons now to be assigned we reverse the holdings of the trial court in said decree that the lease from George Looney and others, involved in the suit of Lona O'Quin and others, and the lease from J. M. McClanahan and others, involved in the McClanahan and Shortridge suit, be forfeited, canceled and annulled as to the interests of the complainants in said two causes.

Involved in the O'Quin suit were 71 acres owned by Lona O'Quin, 71 acres formerly owned by Lydia Fletcher, and 46 acres formerly owned by Eva Fletcher. The Looney lease of 1931 covered these tracts and also two others now owned by Mrs. Maude McFall Miller, one of 63 acres and the other of 93 acres. The record does not show the status of the additional area covered by the lease.

The tipple and headhouse of the lessee are located on the land of Mrs. Miller, who is not a party to this suit. It was stipulated that the

tipple, headhouse, railroad siding and other equipment and machinery of the lessee necessary to operate the properties included in the Looney lease and the McClanahan lease are in good condition and can be put in immediate operating condition in nominal time and with nominal expense; and, further, that the lessee is willing to pay to all of the complainants any minimum royalties which may be found by the court to be due and owing, according to the terms of the lease, although it asserts that no minimum royalties are in fact due.

Lona O'Quin testified that she had received no minimum royalties since 1945 and that the last mining done on the lands involved in these suits was in 1954. The only time she had ever inquired about the minimum royalties, she said, was about a year ago, 1960, when she talked to the lessee's president over the telephone and he said he was mailing checks to the Fletchers. Thomas Fletcher, surviving husband of Lydia Fletcher, testified that he had received no minimum royalties for eight or ten years, but until this suit was instituted he had not complained about it to the lessee. He testified that the last mining on the Lydia Fletcher tract was done two or three years ago, i.e., 1959 or 1958. Avery and Kenneth McClanahan, grandsons of George Looney, testified that they had received no minimum royalties since 1945.

George Looney died in 1945, and a controversy among his widow and children as to who was entitled to certain haulage royalties under the Looney lease was decided in 1953 in the suit of Lona O'Quin et al. v. Pattie Looney et al., 194 Va. 548, 74 S.E. 2d 157.

George W. McClanahan, son of J. M. McClanahan, testified that the last royalty he received under the McClanahan lease was in 1958; that he mined some coal from the Clintwood seam in the lease under a contract with Mr. French, president of the lessee company, starting the work the first of December 1959. He quit the following May, he said, at the request of the McClanahan heirs because French did not pay the royalty on that coal. Some of the last mining done by the lessee, he said, was in the Eagle seam (the first seam under the Clintwood seam) about 1954 or 1955, which was about the time lessee shut down.

He testified that he had never talked to the lessee about why the royalties had not been paid to the heirs other than in 1957 when they met with French in the office of an attorney in Lebanon, at which time French agreed to pay up and made a check to J. L. Looney, Administrator of J. M. McClanahan, who had died in 1952. Looney testified that after his appointment checks for minimum royalties

were paid to him as administrator and in March 1957 he paid to the McClanahan heirs $2,310.76 for back minimum royalties, and later received several other checks for quarterly payments in 1958 and 1959, with the request from the lessee that he distribute them to the McClanahan heirs. In February 1960 Looney wrote to the lessee that some of the McClanahan heirs had refused to accept their share of these checks and afterwards the lessee sent its check to the husband of Osie Shortridge for the first quarter of 1960 in a letter calling attention to the checks in the hands of Looney, and explaining its difficulty in ascertaining the McClanahan heirs. The present suits were instituted in April 1961.

Charles W. French, president and treasurer of Home Creek, testified that he and his brother owned and managed the company until the latter's death in 1955. Since 1955 the company itself has not mined coal on the property and the mining done since then has been by contract with others. The evidence does not show that this has been in any substantial quantity. French testified that his company ceased mining because of the labor situation which was causing very substantial operating losses and that the only alternative was to shut down until they could get relief, "which took quite some time," but that he was now ready and able to continue to operate, and was presently negotiating a contract with a person of recognized ability and financial standing. His evidence in that regard was supported by the testimony of the person with whom he was negotiating.

French testified that he had at all times maintained the property and equipment in good condition, had kept two men on the premises to take care of the property, had spent on it in 1960 between seventeen and eighteen thousand dollars, and that his books showed an investment in improvements amounting to $156,168.24.

The rights of the parties to these two suits are to be determined primarily by what was agreed in the two lease contracts referred to above. The stipulated terms were fifty years in one and forty years in the other, with privilege of renewal for like terms. Each had a special termination clause which provided that notwithstanding the term fixed the lease should terminate when all the workable and minable coal has been mined, which means in the Looney lease "only such coal as can be mined at reasonably fair and just expenditure," and in the McClanahan lease only such as could be mined "at reasonable, fair and just profit," and when such time, in the opinion of the lessee, arrived, the lessee shall give notice to the lessors in writing and the lessors are given the opportunity then to determine whether all such

coal had in fact been mined. Also, both before and after the coal on the leased premises has been mined, the lessee was given the right to transport coal over the leased premises from other lands at the rate of one cent a ton with a minimum royalty of $720 per year after the coal on the leased premises is mined out.

Additionally the lessee agreed to pay $1,000 per year as minimum royalty, as long as it continues to mine coal from the leased premises. For the non-payment of royalties the lessors are given by the leases all the remedies accorded to landlords by Virginia law, as well as a lien on all property of all kinds which the lessee may at any time have on the leased premises.

At the time the leases were made, and apparently until recent years, it was thought that the only merchantable and minable coal as defined in the lease was in the Clintwood, or big, seam. The Looney lease refers to "the seam of coal intended to be mined hereunder" and it was expressly understood and agreed that the lessee should determine in its discretion whether it could mine at a reasonable profit the next seam under the big seam. The bill in the McClanahan suit alleged that at the time the mining ceased in the Clintwood seam no other seam could have been mined at a fair, reasonable and just profit.

The evidence, however, is to the effect that there are probably other seams of coal on the leased premises that should be mined under the terms of the leases and the lessee asserts its readiness to mine them.

It is clear that the lessee has not at any time had an affirmative intent to abandon the leases. It has at considerable expense maintained and preserved the property and asserts now its ability and purpose to continue mining. It appears to be in default, it is true, in the payment of royalties, at least to some of the complainants entitled under the Looney lease. That lease provides that the minimum royalty of $1,000 a year shall be paid to the lessors each year, as long as the lessee continues to mine coal from the leased premises, whether it mines enough coal to produce that amount at the tonnage royalty or not. In view, however, of the language of the lease and the circumstances attending the payment of royalties referred to above, it cannot fairly be said that such default in payment as exists should be attributed to bad faith or a purpose to abandon the leases.

The same may be said of the alleged delay in mining. There could well have been a question in the minds of both lessors and lessee as to the coal the lessee was required to mine. It was definitely agreed that the lessee was not required to mine at a loss. Its evidence that

it would have done so had it continued mining when it ceased its operations is not controverted. It could reasonably have concluded, particularly in the absence of complaint from the lessors, that the purpose of the minimum royalties was to take care of that situation.

If it be established that the lessee has been guilty of undue delay in prosecuting its mining operations, it is more clearly established that at no time prior to the bringing of these suits have the lessors or any of them complained of the delay or asserted that the lessee was thereby violating the provisions of the leases.

There was no provision for forfeiture in either lease, and, generally, unless there is such express provision, the breach of a covenant of the lease does not work a forfeiture. Even express forfeiture provisions are usually considered to be for the benefit of the lessor and may be waived by him. 58 C.J.S., Mines and Minerals, § 184 b(1), p. 393, § 190, p. 407; 32 Am. Jur., Landlord and Tenant, §§ 848, 849, pp. 720, 722; 13 Mich. Jur., Mines and Minerals, §§ 51, 53, pp. 69, 71.

"The general doctrine is admitted that equity does not favor penalties and forfeitures, and will not, ordinarily, lend its active aid to enforce them, but will leave the parties to pursue their legal remedies. * *." *Laurel Creek, &c., Co.* v. *Browning,* 99 Va. 528, 534, 39 S.E. 156, 158. *Horse Creek Coal Land Co.* v. *Trees,* 75 W. Va. 559, 84 S.E. 376.

There are, of course, situations in which a covenant to mine within a reasonable time may be implied and the failure of the lessee to do so will work a forfeiture of the lease. *Clintwood Coal Corp.* v. *Turner,* 133 Va. 464, 114 S.E. 117, in which the earlier Virginia cases on the point are reviewed, is an example. The mining lease there involved contained a provision for speedy mining, which the lessee breached, but the court said: "If the lease had been silent on the subject, there would have been an implied condition that the lessee should begin to prospect and to operate the mine within a reasonable time. * *." But it also said:

"It is, of course, competent for a lessor to confer upon the lessee the right to operate only so long as he can make a profit, but this right must be clearly provided for. The general rule of interpretation, and the one consonant with reason, is that where the only consideration for a mining lease is the royalty on coal actually mined, the lessee must operate with reasonable dilegence, and failing in this, must surrender the property. * * ."

Here the royalty on coal actually mined was not the only consid-

eration. There was a substantial minimum royalty, equivalent in the Looney lease to an annual mining of 10,000 tons, and in the McClanahan lease to an annual mining of 15,000 tons.

In *Reis* v. *Norton Coal Corporation,* (Ky.), 346 S.W. 2d 8, 87 A.L.R. 2d 1073, the Kentucky Court of Appeals said that in no case had it adjudicated an abandonment where the lessee had continued to pay minimum royalties in a substantial amount; and in an annotation to that case, 87 A.L.R. 2d at 1078, it is said:

"Generally speaking, the conclusion from the cases seems to be that the question whether the payment of minimums precludes the forfeiture of a mining lease for failure of development is chiefly one of the intention of the parties except where the acceptance of such payments operates to prevent forfeiture on principles of waiver or estoppel. And in respect to abandonment, it would appear that the payment of minimums operates to prevent a forfeiture on such ground."

See also *Smith* v. *Pocahontas Fuel Co.,* 177 Va. 267, 13 S.E.2d 301; *Burnett Coal Mining Co.* v. *Schrepferman,* 77 Ind. App. 45, 133 N.E. 34 (1921); *Weatherly* v. *American Ag. Chem. Co.,* 16 Tenn. App. 613, 65 S.W.2d 592 (1933); *Frierson* v. *International Ag. Corp.,* 24 Tenn. App. 616, 148 S.W.2d 27 (1940).

On the sum of the provisions of the leases, the remedies provided for the collection of unpaid royalties, the means available to the lessors to require greater diligence in mining, the failure of the lessors to complain about the non-payment of royalties or the delay in mining prior to the bringing of these suits, which could reasonably have been taken by the lessee as acquiescence by the lessors in its methods and a waiver of the rights now asserted by them, we hold that equity should not enforce a forfeiture of the two leases here involved. The unmined coal remains in the ground and the lessee is required to pay the lessors for all that is merchantable and minable as it is mined, with substantial minimum sums which must be paid as long as the mining continues.

The decree below, forfeiting and canceling these two leases, is therefore reversed and the cases involving them are remanded with direction that an accounting be ordered to ascertain as of the date thereof, at the cost of the lessee, the amount of any and all unpaid royalties, minimum, tonnage and haulage, due and payable under each of the leases, with interest from the dates payable, and to whom same shall be paid, and requiring or securing the payment thereof by the

lessee before mining operations are resumed, and directing the manner in which future payments shall be made.

*Modified in part, reversed in part and remanded.*