PRESENT:  Lemons, C.J., Goodwyn, Mims, Powell, Kelsey, and Roush, JJ., and Millette, S.J.


VIRGINIA FUEL CORPORATION, ET AL.

OPINION BY

v.  Record No. 150317

JUSTICE JANE MARUM ROUSH

January 7, 2016

LAMBERT COAL COMPANY, INC.


FROM THE CIRCUIT COURT OF DICKENSON COUNTY
Henry A. Vanover, Judge

In this appeal, we consider whether the circuit court erred in granting summary judgment to the plaintiff in an action for breach of contract, in sustaining the plaintiff's demurrer to the defendants' counterclaim alleging breach of contract, and in dismissing the defendants' affirmative defense of recoupment.

I.  Facts and Proceedings

The appellants in this case are Virginia Fuel Corporation ("Virginia Fuel") and James C. Justice Companies, Inc. ("Justice Companies"); the appellee is Lambert Coal Company ("Lambert").  On June 21, 2010, Virginia Fuel and Lambert entered into an agreement by which Virginia Fuel agreed to acquire certain assets owned by Lambert (the "Agreement").  The specific assets to be acquired were identified on Exhibit "A" to the Agreement as a mining permit described as "Permit No. 1101673 — Dark Hollow Strip Mine" and two coal leases described as

> Lambert Land, LLC ("LL") coal-only and Heartwood Forestland (HFL) surface over the LL coal which the royalty together is from 8-10% on 1.1 million tons and the adjacent Alpha Coal ("Alpha") fee property at 8% (approx. 400,000 tons).

(The LL lease shall be referred to as the "Lambert Land Lease"; the Alpha Coal lease shall be referred to as the "Alpha Lease"; the Lambert Land Lease and the Alpha Lease shall be referred

to collectively as the "Leases".)  The purchase price for the assets sold under the Agreement was $2,500,000.  Two hundred thousand dollars of the purchase price was paid as a deposit upon the execution of the Agreement and was credited at closing to the portion of the purchase price allocated to the mining permit.  The Agreement further provided that:

> The balance of the [p]ayment, will be royalty for the coal mined under the Alpha [L]ease and the [Lambert Land] Lease, Lambert being a "sublessor" under IRC § 631, payable monthly at the rate of $2.00 per ton of coal mined, with a minimum monthly royalty of $40,000.00.

The Agreement provided that "[a]s soon as possible after signing this letter of [i]ntent, the parties shall negotiate the Assignment and Assumption Agreements, which shall contain customary provisions, conditions, representations, warranties, and terms that are mutually agreeable to the parties."  Despite Lambert's and Virginia Fuel's undertaking "in good faith . . . [to] use their best efforts to negotiate the Assignment and Assumption Agreements" there is no evidence in the record before us that any such assignment and assumption agreements were executed by Lambert and Virginia Fuel.

Closing under the Agreement occurred on July 13, 2010.  On that date, Lambert and Virginia Fuel entered into a security agreement (the "Security Agreement"), whereby Virginia Fuel, as "Borrower," granted to Lambert, as "Lender," a security interest in the mining permit, along with Virginia Fuel's inventory and accounts receivable, in order to secure Virginia Fuel's obligation to pay the balance of the purchase price under the Agreement.  The Security Agreement provided that "[f]or purposes of default in payment of royalty under the Agreement, payments shall be deemed delinquent if not received by [Lambert] on or before the 15th of the month following the month in which the mineral is mined for purposes of computing the royalty."

Also on July 13, 2010, Justice Companies executed a "Guaranty of Payment and Performance" (the "Guaranty") pursuant to which Justice Companies guaranteed Lambert's obligations under the Agreement, including the payment in full of the $2,300,000 deferred purchase price due under the Agreement. The Guaranty provided, in a recital, that "pursuant to the Agreement, [Lambert] extends credit to [Virginia Fuel] to be repaid by the mining of coal under DMLR Permit 1101673 . . . ."

Virginia Fuel began mining coal in accordance with the mining permit and the Leases. Virginia Fuel made most of the payments required under the Agreement until March 2013. After March 2013, Virginia Fuel stopped making the minimum monthly payment of $40,000.

Lambert filed suit against Virginia Fuel and Justice Companies on August 13, 2013. In its complaint, Lambert alleged that Virginia Fuel continued to mine coal pursuant to the mining permit and the Leases, but that Virginia Fuel had not made the minimum monthly payments of $40,000. Lambert alleged that it had demanded payment from Virginia Fuel, but that Virginia Fuel had not cured the default. Accordingly, Lambert accelerated the balance due under the Agreement. Lambert sought judgment against Virginia Fuel under the Agreement and Justice Companies under the Guaranty for the balance due of $1,001,706.94, plus costs and attorney's fees.

In response to the complaint, Virginia Fuel and Justice Companies filed an answer and grounds of defense in which they denied that they were obligated to Lambert for the unpaid purchase price and asserted the affirmative defense of "credit and/or offset" in an amount equal to the coal that Lambert "represented it was providing to [Virginia Fuel], but did not provide" or "was not able to provide" because "the coal was not available for [Virginia Fuel] as had been represented and agreed by [Lambert]."

3

Virginia Fuel and Justice Companies also filed a counterclaim against Lambert in which they alleged causes of action for breach of contract and constructive fraud. After Lambert filed a plea in bar alleging that the fraud count was barred by the statute of limitations, that claim was nonsuited. The breach of contract count of the counterclaim sought damages of $359,000, representing the "pro rata coal tonnage value from the Agreement which contained a $2.3 million purchase price for 1.5 million tons of coal when in fact there are only approximately 1.269 million tons of coal contained within the [Lambert Land] Lease and the Alpha Lease, collectively."[1] On February 27, 2014, Lambert's demurrer to the breach of contract claim was sustained, with leave to amend within 14 days. Virginia Fuel and Justice Companies elected not to amend their counterclaim. [2]

In response to requests for admission, Virginia Fuel and Justice Companies admitted that Virginia Fuel had paid $1,298,293.06 of the deferred purchase price of $2,300,000 under the Agreement. Thus, Virginia Fuel conceded that it had not paid the balance of $1,001,706.94, which was the amount of Lambert's ad damnum.

Lambert moved for summary judgment on its complaint alleging Virginia Fuel's breach of the Agreement and Justice Companies' breach of the Guaranty. Lambert argued that there was no dispute about the amount of the deferred purchase price that remained unpaid. Further, Lambert argued, Virginia Fuel's and Justice Companies' defense of "credit/and or offset" was in

---

[1] After discovery, Virginia Fuel and Justice Companies revised downward their estimate of the actual tonnage of mineable coal on the Lambert Land Lease to 668,000 tons. In addition, the actual amount of mineable coal on the Alpha Lease was approximately 163,000 tons. The complaint, however, was not amended to reflect the revised estimates of mineable coal.

[2] On August 7, 2014, Virginia Fuel and Justice Companies re-filed their counterclaim alleging anew their cause of action for constructive fraud and adding a cause of action for reformation of the Agreement. In that this counterclaim was filed without leave of court, it was dismissed. Virginia Fuel and Justice Companies did not assign error to the dismissal of their second counterclaim and thus it is not part of this appeal.

effect a defense of recoupment, which failed as a matter of law because Lambert made no material misrepresentations as to the amount of mineable coal under the Leases.

Virginia Fuel and Justice Companies opposed summary judgment, arguing that a genuine issue of material fact existed as to whether Lambert negligently represented the amount of coal tonnage contained within the Leases.

On June 20, 2014, Lambert noticed its motion for summary judgment for a hearing on September 3, 2014. On August 26, 2014, five business days before the scheduled hearing, Virginia Fuel and Justice Companies propounded their first discovery requests to Lambert. On September 2, 2014, the day before the hearing, Virginia Fuel and Justice Companies moved for a continuance of the hearing based on both Lambert's failure to respond to the discovery requests and the pendency of their renewed counterclaim, which they filed on August 7, 2014, without obtaining prior leave of court.

The circuit court denied the request to continue the hearing on Lambert's motion for summary judgment. The renewed counterclaim was dismissed because it had been filed without leave of court. The circuit court granted summary judgment in favor of Lambert, ruling that there was no genuine issue of any material fact in the case. The circuit court ruled that Virginia Fuel and Justice Companies were "unable to move forward with their Constructive Fraud/Negligent Misrepresentation Counterclaim due to their failure to seek leave from the [c]ourt." Therefore, the "pleadings, admissions, and interrogatories show that no material fact is in dispute and summary judgment is appropriate as a matter of law."[3]

---

[3] No party objected to the use of interrogatory responses to support Lambert's motion for summary judgment. See Rule 3:20 (summary judgment may be granted based on "the pleadings, the orders, if any, made at a pretrial conference, [and] the admissions, if any, in the proceedings . . . .").

Virginia Fuel and Justice Companies appealed. We granted three assignments of error:

1. The trial court erred in granting plaintiff's motion for summary judgment.

   a. The trial court misconstrued and/or failed to construe the meaning of the purchase agreement and its Exhibit A, including the royalty, "coal mined," and coal tonnage provisions.

   b. The trial court erred in finding that there were no genuine issues of material fact in dispute on the plaintiff's breach of contract claim.

   c. If the coal tonnage provision in the purchase agreement was ambiguous, the trial court erred in deciding the meaning of the agreement as a question of law, and in failing to consider evidence to ascertain its meaning and the parties' intent.

   d. No admissions or discovery responses entitled the plaintiff to summary judgment.

   e. The trial court erred in denying defendants' motion for a continuance of the summary judgment hearing.

2. The trial court erred in sustaining the plaintiff's demurrer to the defendants' breach of contract counterclaim.

   a. The trial court erred in finding that the defendants' breach of contract counterclaim sounds in tort.

   b. The trial court erred in finding that the Purchase Agreement only obligated the plaintiff to convey the mining permit and mining leases.

3. The trial court erred in dismissing defendants' affirmative defenses of recoupment or credit.

## II. Discussion

### A. Summary Judgment

The first assignment of error concerns the circuit court's grant of summary judgment to Lambert. "In an appeal from a circuit court's decision to grant or deny summary judgment this Court reviews the application of law to undisputed facts de novo." Deutsche Bank Nat'l Trust

6

Co. v. Arrington, 290 Va. 109, 114, 772 S.E.2d 571, 573 (2015) (quoting St. Joe Co. v. Norfolk Redevelopment & Hous. Auth., 283 Va. 403, 407, 722 S.E.2d 622, 625 (2012)). Further, this Court reviews the circuit court's interpretation of an agreement de novo. Pocahontas Mining LLC v. CNX Gas Co., 276 Va. 346, 352, 666 S.E.2d 527, 530 (2008). "The question whether the language of a contract is ambiguous is a question of law which we review de novo." Robinson-Huntley v. George Washington Carver Mut. Homes Ass'n, 287 Va. 425, 429, 756 S.E.2d 415, 418 (2014) (quoting Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 631, 561 S.E.2d 663, 667 (2002)). "Contract language is ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time. However, a contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." Id. (quoting Eure, 263 Va. at 632, 561 S.E.2d at 668).

In reviewing a circuit court's grant or denial of summary judgment, we "apply[] the same standard a trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason." Fultz v. Delhaize America, Inc., 278 Va. 84, 88, 677 S.E.2d 272, 274 (2009).

Virginia Fuel and Justice Companies argue that the trial court erred in granting summary judgment because "the language of the [Agreement] and related agreements plainly contemplates that $2.3 million of the purchase price would be paid as royalty from coal mined under the [L]eases. If that coal could not be mined, then the obligation to pay royalties ceased." Further, "[e]ven the minimum royalty payment [of $40,000] [was] to be paid from 'coal mined' under the [L]eases." Alternatively, Virginia Fuel and Justice Companies contend that the Agreement is

ambiguous and, therefore, the parties should have been afforded the opportunity to introduce parol evidence to enable the factfinder to determine the parties' intent.

Lambert responds that "payment of the deferred purchase price was not tied to mining coal because the [p]urchase Agreement did not require [Virginia Fuel] to mine any coal." Lambert observes that, pursuant to the interpretation advocated by Virginia Fuel and Justice Companies, if Virginia Fuel decided not to mine any coal, Lambert would not be entitled to any portion of the deferred purchase price. Lambert asserts that such a result would be "patently absurd." Further, Lambert maintains that the term "minimum monthly royalty" means "an unconditional covenant or guarantee of payment regardless of the circumstances or conditions encountered during the mining process, the economic feasibility of continued mining, or the remaining quantity of mineable and merchantable coal." In Lambert's view, the payment of the deferred purchase price was tied to the minimum monthly royalty and not to the mining of coal. We agree with Lambert.

Under the Agreement, Virginia Fuel purchased Lambert's rights under the mining permit and Lambert's rights as lessee under the Leases. The transaction was structured as an outright sale and not as a lease or sublease. In effect, Virginia Fuel purchased the right to step into Lambert's position as the operator under the mining permit and as lessee under the Leases. The sales price for the assignments was established as $2,500,000, with $200,000 paid upon signing of the Agreement and the balance of $2,300,000 paid over time, but at a minimum monthly amount of $40,000 until paid in full. No provision of the Agreement excused Virginia Fuel's payment of the minimum monthly payment if the coal available proved to be less than expected.

The provisions of the Security Agreement make clear that Virginia Fuel was required to pay the deferred purchase price regardless of the amount of coal mined. The Security Agreement

8

was given to secure payment of "all indebtedness." "Indebtedness" was defined as including the $2,300,000 deferred purchase price payable under the Agreement. The Agreement required payment of a "minimum monthly royalty of $40,000." Virginia Fuel would be in default if the royalty due under the Agreement was not paid by the fifteenth day of the month following the month in which the coal was mined for the purpose of computing the royalty. Upon default, Lambert had the option of declaring that all of the indebtedness, including principal and interest, was immediately due and payable.

Similarly, under the Guaranty, Justice Companies unconditionally and absolutely guaranteed "full and prompt" payment to Lambert of the "Indebtedness," which was defined as including the $2,300,000 deferred purchase price under the Agreement.

Thus, reading the Agreement, the Security Agreement, and the Guaranty together,[4] it is manifest that the obligation of Virginia Fuel to pay both the deferred purchase price and the minimum monthly royalty was not dependent on the amount of available, mineable coal.

Virginia Fuel's and Justice Companies' reading of the Agreement that both the minimum monthly payment and the royalty of $2.00 per ton were only payable out of mineable coal creates an untenable result. Under that argument, if no coal was ever mined, no payment would be due to Lambert other than the initial $200,000 allocated to the value of the permit. There was no provision in the Agreement that the mining permit or the Leases would revert back to Lambert if Virginia Fuel never mined any coal, or mined less coal than necessary to result in payment in full of the deferred purchase price of $2,300,000. It is illogical to assume that Lambert would have

---

[4] See Countryside Orthopaedics, P.C. v. Peyton, 261 Va. 142, 151, 541 S.E.2d 279, 284 (2001), where we observed that "where two papers are executed at the same time or contemporaneously between the same parties, in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument." (Citations and internal quotation marks omitted.) See also, e.g., Bailey v. Town of Saltville, 279 Va. 627, 633, 691 S.E.2d 491, 493 (2010) (same) (citing cases).

sold the right to mine what it estimated to be 1.5 million tons of coal for payment of no more than $200,000.

Relying on Home Creek Smokeless Coal Co. v. Combs, 204 Va. 561, 132 S.E.2d 399 (1963), Virginia Fuel and Justice argue that the use of the term "royalty" in the Agreement imposes on Virginia Fuel a duty to mine coal. Thus, they argue, Lambert would always be paid something until the mine was exhausted. Virginia Fuel and Justice Companies misread Home Creek Smokeless Coal. In that case, we opined that:

> The general rule of interpretation, and the one consonant with reason, is that where the only consideration for a mining lease is the royalty on coal actually mined, the lessee must operate with reasonable diligence, and failing in this, must surrender the property.

Id. at 571, 132 S.E.2d at 406. In that case, as in the present case, "the royalty on coal actually mined was not the only consideration. There was [also] a substantial minimum royalty." Id. at 571-72, 132 S.E.2d at 406. Under that circumstance, we held, the coal lease was not forfeited by the lessor's failure to mine as long as the minimum royalty payments were made. Id. at 572, 132 S.E.2d at 407. Thus, under the holding of Home Creek Smokeless Coal, Virginia Fuel had no implied duty to mine coal because the Agreement required minimum monthly royalty payments.

Lambert advances the only reading of the Agreement that is not strained, illogical, or contrary to reason. Given that there was no obligation of Virginia Fuel to mine any coal, the amount of $40,000 represented the minimum payment due to Lambert each month regardless of whether Virginia Fuel mined any coal. If Virginia Fuel elected to mine coal, it might owe more than $40,000 if the coal mined exceeded 20,000 tons. In that event, Virginia Fuel would be required to pay $2.00 for every ton mined over 20,000 tons. The provision of the Security Agreement that payment was due on the fifteenth day of the month "following the month in which the mineral is mined for purposes of computing the royalty" did not mean that if no coal

10

was mined, no payment was due. Instead, that provision simply established that the amount due — either $40,000 or more — would be computed based on operations during the calendar month, with payment due on the fifteenth of the next month. If no coal was mined in a given month, or if the amount of coal mined was 20,000 tons or less, the minimum payment would be due. If more than 20,000 tons was mined in the month, the royalty would be calculated and payment due by the fifteenth of the next month. Payments were due until Lambert received the full $2,300,000 deferred purchase price.[5]

Our conclusion that Virginia Fuel was not excused from payment of the deferred purchase price because the coal present was less than it expected is supported by case law from other jurisdictions. In Timlin v. Brown, 28 A. 236 (Pa. 1893), two lessees entered into a lease to mine coal on the plaintiff's land for a period of ten years. The lessees agreed to mine a minimum of 10,000 bushels a year and pay plaintiff a royalty of one half cent per bushel. If they mined less than 10,000 bushels, the lessees agreed to pay the minimum royalty of $50 per year. Id. at 237. After seven years, the lessees ceased operations because the coal seam had been exhausted. The Supreme Court of Pennsylvania held that they were obligated to pay the plaintiff landowner $50 a year for the remaining term of the lease, reasoning that:

> [t]here is nothing in the contract indicating any intention to modify or relieve the defendants from their absolute obligation to pay on the contingencies of the mine proving unprofitable, or of exhaustion of the coal before the end of the term, . . .

---

[5] The recital in the Guaranty that "pursuant to the Agreement, [Lambert] extends credit to [Virginia Fuel] to be repaid by the mining of coal under DMLR Permit 1101673 . . ." does not change our analysis. Recitals in a contract are not binding on the parties. See, e.g., Whetstone Candy Co. v. Kraft Foods, Inc., 351 F.3d 1067, 1074 (11th Cir. 2003) (opining that "'whereas' clauses are not binding when the contract is otherwise unambiguous") (citation omitted), People v. Forsyth, 292 P.3d 1248, 1258, n. 97 (Colo. 2012) (noting that recitals are not binding obligations unless referred to in the operative provisions of the contract). Instead, recitals are merely explanations of "the reasons for entering into [the contract] or the background of the transaction . . . ." Black's Law Dictionary 1462 (10th ed. 2014).

[The lessees did] not protect [themselves] from buying too dear, by stipulating for a deduction should the quantity fall short of 100,000 [bushels in ten years].

Id.

Similarly, in National Coal Co. v. Overholt, 94 S.E. 735 (W. Va. 1917), a coal company entered into a coal lease with the landowners for a period of ten years. A royalty was payable equal to ten cents for every ton of "run of mine coal" mined from the leased property. Id. at 736. The lessee agreed to pay an annual minimum royalty of $2,500 in the first year and $3,000 for the remaining years of the lease. Id. Prior to the expiration of the lease term, the coal company ceased mining coal on the leased property, having determined that the amount of "merchantable and obtainable coal" was exhausted. Id. at 737. The Supreme Court of West Virginia held that the lessee was obligated to pay the minimum royalty of $3,000 per annum for the entire term, regardless of the quantity of coal mined. The court reasoned:

> The English and many American decisions hold that when in a mining lease the parties contract with reference to a mineral known to exist, but the quantity is unknown, and incapable of certain ascertainment, and the lessee covenants to mine and bring forth a minimum quantity of the product annually, or at other intervals, and to pay a minimum royalty therefor whether mined or not, the contract amounts to a sale of the mineral in the land, and that the lessee is bound to pay the minimum price, whether mined or not, and whether it exists or not.

Id. at 738 (citing Timlin and collecting cases).

In Babcock Coal & Coke Co. v. Brackens Creek Coal Land Co., 37 S.E.2d 519 (W. Va. 1946), the plaintiff coal company leased from the defendant in 1920 "all coal" in a described seam underlying a 368-acre tract of land for a period of thirty years. Id. at 520. The lessee agreed to pay a royalty of ten cents for every ton of coal mined. The lessee further agreed that beginning in 1922 it would pay a "minimum rent or royalty" of $3,000 per year. Id. In 1944, the lessee notified the landowner that it was cancelling the lease, as there no longer remained coal of sufficient quality or quantity to be profitably mined. Id. at 521. The lessee sued to cancel the

12

lease. The Supreme Court of West Virginia held that the lessee was not entitled to rescission of the lease. The court observed:

> In addition to the stipulation relative to payment of royalty for minerals actually mined, many leases contain a provision that minimum royalty shall be paid regardless of whether coal is actually mined. These provisions are classified: (1) those requiring payment of minimum royalty regardless of the amount of minerals mined, and (2) those requiring that a stipulated amount of minerals shall be mined. If the stipulation is of the first class a lessee is liable for the payment of minimum royalty although no minerals are or could be mined; if of the second class and the lessee did not assume the risk of exhaustion of the minerals, his obligation to pay the minimum royalty is discharged if the minerals do not exist.

Id. at 522 (citations omitted). The court found that the provision for minimum royalties "clearly shows that . . . [the lessee] assumed the risk of the existence of coal to be mined from [the lessor's] land sufficient in quantity to aggregate the total minimum royalties for the term of the lease." Id. at 523.

Although Timlin, National Coal, and Babcock Coal involved the rights and duties of lessors and lessees under coal mining leases, rather than under an asset sale agreement such as the Agreement in this case, we are persuaded by their reasoning. Whether under a lease or an asset purchase agreement, when the payment due to the lessor or landowner is expressed as a minimum monthly royalty, the party mining the mineral is not excused from payment if the mineral is of insufficient quantity to be profitably mined in quantities adequate to pay the royalties due. See generally Robert Tucker Donley, The Law of Coal, Oil & Gas in West Virginia & Virginia § 120 (1951) (distinguishing minimum royalty payments from minimum tonnage requirements and noting that, if the agreement contains minimum tonnage requirements, the obligor may be excused from payment under a defense of impossibility of performance when the mine is depleted).

Summarizing, we hold that the circuit court did not err when it granted summary judgment to Lambert on its complaint. In that Virginia Fuel was not obligated to mine any coal and agreed to pay a monthly minimum royalty, Virginia Fuel was not excused from paying the full amount of the deferred purchase price because it found less mineable coal on the Lambert Land Lease than it expected. Virginia Fuel admitted that it paid only $1,298,293.06 of the deferred purchase price of $2,300,000, leaving a balance due of $1,001,706.94. Justice Companies admitted that it had guaranteed payment in full of the deferred purchase price. The circuit court correctly concluded that there was no material fact in dispute and that summary judgment in favor of Lambert was appropriate.

## B. Denial of Continuance

As a subpart of the first assignment of error, Virginia Fuel and Justice Companies contend that the trial court erred in denying their request to continue the hearing on Lambert's motion for summary judgment.

> The decision to grant a motion for a continuance is within the sound discretion of the circuit court and must be considered in view of the circumstances unique to each case. The circuit court's ruling on a motion for a continuance will be rejected on appeal only upon a showing of abuse of discretion *and* resulting prejudice to the movant.

Haugen v. Shenandoah Valley Dept. of Soc. Servs., 274 Va. 27, 34, 645 S.E.2d 261, 265 (2007) (emphasis in original).

Applying that standard to the facts of this case, we hold that the circuit court did not abuse its discretion in denying the continuance request where the case had been pending for over a year, the hearing on the motion for summary judgment had been scheduled more than 10 weeks in advance, and the claimed grounds for the continuance had been self-created by Virginia Fuel and Justice Companies only five business days

14

before the scheduled hearing when they filed for the first time discovery requests and then objected that Lambert had not responded to the discovery – even though responses were not yet due.

### C. Demurrer to the Counterclaim

The second assignment of error concerns the circuit court's sustaining Lambert's demurrer to Count I of Virginia Fuel's and Justice Companies' original counterclaim alleging breach of contract. "A trial court's decision sustaining a demurrer presents a question of law which we review de novo." Desetti v. Chester, 290 Va. 50, 56, 772 S.E.2d 907, 909 (2015) (quoting Harris v. Kreutzer, 271 Va. 188, 195, 624 S.E.2d 24, 28 (2006)). "A demurrer accepts as true all facts properly pled, as well as reasonable inferences from those facts." Id. (quoting Steward v. Holland Family Props., LLC, 284 Va. 282, 286, 726 S.E.2d 251, 253 (2012)).

The counterclaim alleged that, under the Agreement, Lambert represented to Virginia Fuel that the Lambert Land Lease was "made up of 1.1 million tons of coal" and that the Alpha Lease was "made up of approximately 400,000 tons [of coal]." Virginia Fuel and Justice Companies further alleged that the representations as to the amount of coal on the Leases were material terms of the Agreement, and that Virginia Fuel would not have entered into the Agreement but for those representations.

The counterclaim alleged that the amount of coal on the Lambert Land Lease was actually 869,000 tons.[6] Accordingly, Virginia Fuel and Justice Companies alleged that Lambert had breached the Agreement "by failing to deliver the amount of coal tonnage it represented in the Agreement." They sought damages in the amount of $359,000, representing the difference in

_____

[6] All of the claimed damages in the counterclaim arise from the alleged shortfall in the amount of coal represented to be on the Lambert Land Lease. Although the Alpha Lease is mentioned in the counterclaim, there is no allegation in the counterclaim that Lambert breached the Agreement because the amount of coal located on the Alpha Lease proved to be less than the "approx. 400,000 tons" as stated in the Agreement.

15

"pro rata coal tonnage value" represented to be present on the Lambert Land Lease and the amount of mineable coal actually present.

Lambert filed a demurrer to the breach of contract count of the counterclaim. Lambert alleged that, pursuant to the Agreement, Lambert gave Virginia Fuel "access to the records associated with the mining operations as well [as] an opportunity 'to conduct a physical investigation of [Lambert's] facilities and properties' in order to determine among other things the amount of coal on the property." Therefore, "[g]iven the opportunity to inspect, Virginia Fuel, as a matter of law, took the property, business and assets as is." No written response by Virginia Fuel or Justice Companies to Lambert's demurrer to the counterclaim is included in the record.

After a hearing on the demurrer, the circuit court ruled that the counterclaim "as a matter of law fails to state a claim for breach of contract and . . . therefore [Lambert's] [d]emurrer is well taken." Virginia Fuel and Justice Companies were granted leave to amend their breach of contract claim. They elected, however, not to amend the counterclaim and stood on their original counterclaim.

In their "Joint Written Statement of Facts and Other Incidents of the Case Pursuant to Rule 5:11," the parties state that, in sustaining Lambert's demurrer to the breach of contract claim in the counterclaim, the circuit court "ruled from the bench that [the] [c]ounterclaim sounded in tort not contract, that [Lambert] was contractually obligated to convey the mining permit and assign the [Leases], which it did, and that [Virginia Fuel and Justice Companies] failed to state a claim for breach of contract."

Virginia Fuel and Justice Companies argue that the circuit court erred in ruling that the breach of contract claim sounded in tort. We need not decide whether the circuit court erred in

16

stating from the bench that the counterclaim sounded in tort and not in contract. "[I]t is fundamental that 'a court of record speaks only through its written orders.'" Upper Occoquan Sewage Auth. v. Blake Constr. Co., 266 Va. 582, 588, 587 S.E.2d 721, 724 (2003) (quoting Hill v. Hill, 227 Va. 569, 578, 318 S.E.2d 292, 297 (1984)). The circuit court's written order in this case states nothing about whether the counterclaim sounded in contract or tort. Instead, the written order states that the demurrer was sustained with leave to amend because "the [c]ourt [finds] that the . . . [c]ounterclaim as a matter of law fails to state a claim for breach of contract and therefore [the] [d]emurrer is well taken." Implicit in the circuit court's sustaining the demurrer to the counterclaim was its finding that, as a matter of law, Lambert did not represent and warrant that 1.1 million tons of mineable coal would be located on the Lambert Land Lease, which was the sole breach of contract alleged in the counterclaim.

On appeal, Virginia Fuel and Justice Companies argue that Lambert breached the Agreement "by failing to deliver the amount of mineable coal it represented in the Agreement." Lambert responds that the tonnage references on Exhibit "A" to the Agreement were understood to be estimates only and not warranties as to the amount of available coal. We agree with Lambert.

The Agreement provided that the assets of Lambert to be sold to Virginia Fuel pursuant to the Agreement included "certain mining leases as set out in attached Exhibit 'A'." With respect to the Lambert Land Lease, Exhibit "A" stated:

> Coal Leases will be assigned to [Virginia Fuel]. Those current leases include the Lambert Land, LLC ("LL") coal-only and Heartwood Forestland (HFL) surface over the LL coal which the royalty together is from 8-10% on 1.1 million tons . . . .

The reference to "1.1 million tons" in Exhibit "A" with regards to the Lambert Land Lease was insufficient as a matter of law to create a representation and warranty by Lambert that

17

there were, in fact, 1.1 million tons of coal on the Lambert Land Lease. It is clear from the Agreement that the parties intended to enter into separate "Assignment and Assumption Agreements, which shall contain customary provisions, conditions, representations, warranties, and terms that are mutually agreeable to the parties." No such agreements are part of the record.

We agree with Lambert, that Exhibit "A" served merely to identify the assets subject to the sale, and that the reference to "8-10% on 1.1 million tons" was an expression of estimated royalty percentages payable to owners of the coal in addition to the payments due to Lambert under the Agreement, and not a representation or warranty that 1.1 million tons of coal were on the Lambert Land Lease.[7]

Again, our conclusion is supported by case law from West Virginia. In National Coal Co. v. Overholt, the lessee alleged that the lessors represented that "there were in fact 53.14 acres of coal in said boundary of land, and that 345,000 tons of coal could be mined and obtained therefrom ." 94 S.E. at 737. The Supreme Court of West Virginia held that:

> [t]he alleged representation or assurances of the [lessors] that there were at least 310,000 or 345,000 tons of coal in the mine, from the very nature of the subject matter of the contract could have been but the expression of an opinion that that quantity of coal could be obtained from the mine. No one in advance of the actual mining and removal of coal could do other than estimate the amount.

Id. at 738-39.[8]

In sum, we agree with Lambert that nowhere in the Agreement is there a clear, absolute or affirmative promise, guarantee, or warranty of a certain quantity of mineable or merchantable

---

[7] The record does not include a copy of either the Lambert Land Lease or the Alpha Lease.

[8] In quoting this passage from National Coal, we do not suggest that there can never be an enforceable representation or warranty as to the amount of a yet-to-be-mined mineral. Such an enforceable representation or warranty, however, would have to be more definite than the bare recitation in this case that the Lambert Land Lease included a "royalty . . . from 8-10% on 1.1 million tons."

18

coal. Accordingly, we hold that the circuit court did not err in sustaining Lambert's demurrer to the breach of contract count of Virginia Fuel's and Justice Companies' counterclaim.

### D. Dismissal of Recoupment Defense

The third assignment of error concerns the circuit court's dismissal of Virginia Fuel's and Justice Companies' defense of recoupment.[9] The trial court did not expressly dismiss that defense. Virginia Fuel and Justice Companies argue that the trial court "implicitly rejected [this defense] by granting Lambert summary judgment and dismissing the case." Therefore, we apply the same de novo standard of review that we applied in deciding the issue of whether summary judgment was properly awarded to Lambert. See Deutsche Bank, 290 Va. at 114, 772 S.E.2d at 573.

"Recoupment" has been defined as "the right of the defendant to cut down or diminish the claim of the plaintiff in consequence of [the plaintiff's] failure to comply with some provision of the contract sought to be enforced, or because [the plaintiff] has violated some duty imposed upon him by law in the making or performance of that contract." Burks Pleading and Practice § 247, at 438 (4th ed. 1952). See Odessky v. Monterey Wine Co., 188 Va. 184, 189, 49 S.E.2d 330, 332 (1948); Dexter-Portland Cement Co. v. Acme Supply Co., 147 Va. 758, 766-67, 133 S.E. 788, 790 (1926).[10] See also Black's Law Dictionary 1466 (10th ed. 2014) (defining

---

[9] In their answer and grounds of defense, Virginia Fuel and Justice Companies asserted the affirmative defense of "credit and/or offset." The parties have referred to this defense variously as one of "credit," "offset," or "recoupment." The Court will refer to the defense as "recoupment."

[10] A plea of recoupment may be made pursuant to Code § 8.01-422, and we have held that it is not a counterclaim, for example, for purposes of the nonsuit statute. See Bremer v. Doctor's Bldg. P'ship, 251 Va. 74, 80, 465 S.E.2d 787, 790 (1996); Code § 8.01-422 (statutory pleas such as recoupment are allowed in contract actions "against the obligation of the contract").

19

recoupment as "[t]he right of a defendant to have the plaintiff's claim reduced or eliminated because of the plaintiff's breach of contract or duty in the same transaction").

As we have stated above, Lambert did not breach any provision of the Agreement, nor did Lambert breach any duty it had to Virginia Fuel or Justice Companies in the same transaction. Therefore, we hold that the circuit court did not err in implicitly dismissing the defense of recoupment when it granted summary judgment to Lambert.

### III. Conclusion

For the foregoing reasons, we will affirm the judgment of the circuit court granting summary judgment to Lambert on its complaint, sustaining Lambert's demurrer to the counterclaim, and dismissing the defense of recoupment.

<u>Affirmed.</u>